Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARY BULL; JONAH ZERN, and all
others similarly situated; LAURA
TIMBROOK; LEIGH FLEMING; CHARLI
JOHNSON; MICKY MANGOSING;
ALEXIS BRONSON; MARCY CORNEAU;
LISA GIAMPAOLI,
            *Plaintiffs-Appellees,*

            v.

CITY AND COUNTY OF SAN
FRANCISCO; SAN FRANCISCO COUNTY
SHERIFF'S DEPARTMENT; MICHAEL
HENNESSEY, Sheriff; SAN FRANCISCO
COUNTY SHERIFF'S DEPUTIES,
            *Defendants-Appellants.*

No. 05-17080

D.C. No.
CV-03-01840-CRB

MARY BULL; JONAH ZERN, and all
others similarly situated; LAURA
TIMBROOK; LEIGH FLEMING; CHARLI
JOHNSON; MICKY MANGOSING;
ALEXIS BRONSON; MARCY CORNEAU;
LISA GIAMPAOLI,
                   *Plaintiffs-Appellees,*

                   v.

CITY AND COUNTY OF SAN
FRANCISCO; SAN FRANCISCO COUNTY
SHERIFF'S DEPARTMENT; MICHAEL
HENNESSEY, Sheriff; SAN FRANCISCO
COUNTY SHERIFF'S DEPUTIES,
                   *Defendants-Appellants.*

No. 06-15566

D.C. No.
CV-03-01840-
CRB/EMC

OPINION

Appeals from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued March 26, 2009
Submitted April 10, 2009
San Francisco, California

Filed February 9, 2010

Before: Alex Kozinski, Chief Judge, Pamela Ann Rymer,
Sidney R. Thomas, Susan P. Graber, Kim McLane Wardlaw,
Ronald M. Gould, Marsha S. Berzon, Johnnie B. Rawlinson,
Richard R. Clifton, Sandra S. Ikuta, and N. Randy Smith,
Circuit Judges.

Opinion by Judge Ikuta;
Concurrence by Chief Judge Kozinski;
Concurrence by Judge Graber;
Dissent by Judge Thomas

## COUNSEL

Dennis J. Herrera and Danny Chou, City Attorneys; Joanne Hoeper, Chief Trial Attorney; and David B. Newdorf (argued) and Robert A. Bonta, Deputy City Attorneys, for the appellants.

Mark E. Merin and Cathleen A. Williams, Law Office of Mark E. Merin (argued); and Andrew Charles Schwartz (argued) and Thomas A. Seaton, Casper, Meadows, Schwartz & Cook, for the appellees.

## OPINION

IKUTA, Circuit Judge:

The San Francisco Sheriff's Department oversees six county jails in the San Francisco Bay Area, through which approximately 50,000 individuals are booked and processed

each year. To address a serious problem of contraband smuggling in the jail system, Sheriff Michael Hennessey instituted a policy requiring the strip search of all arrestees who were to be introduced into San Francisco's general jail population for custodial housing. In a class action lawsuit challenging this policy on its face, a district court held that it violated the Fourth Amendment rights of the persons searched, and denied Sheriff Hennessey qualified immunity. Hennessey, the San Francisco Sheriff's Department, and the City and County of San Francisco brought this interlocutory appeal, challenging the denial of qualified immunity.[1] A divided panel of this court affirmed the district court's denial, *Bull v. City & County of San Francisco*, 539 F.3d 1193 (9th Cir. 2008), and we granted rehearing en banc. Because we conclude that San Francisco's policy did not violate plaintiffs' constitutional rights, we reverse the district court's denial of Sheriff Hennessey's motion for summary judgment based on qualified immunity, and in doing so necessarily reverse the district court's grant of plaintiffs' motion for partial summary judgment as to Fourth Amendment liability.

I

"A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Indeed, "attempts to introduce drugs and other contraband into [prison] premises . . . is one of the most perplexing problems of prisons." *Hudson v. Palmer*, 468 U.S. 517, 527 (1984); *see Overton v. Bazzetta*, 539 U.S. 126, 134 (2003) ("Drug smuggling and drug use in prison are intractable problems."); *Block v. Rutherford*, 468 U.S. 576, 588-89 (1984) ("We can take judicial notice that the unauthorized use of narcotics is a problem that plagues virtu-

---

[1] We refer to Sheriff Hennessey, the Sheriff's Department, and the City and County of San Francisco by name when appropriate, and otherwise refer to defendants collectively as "San Francisco."

ally every penal and detention center in the country."). San Francisco's six county jails are no exception: They struggle with a serious, ongoing problem of drugs, weapons, and other contraband being smuggled into jail facilities. The record contains hundreds of pages of incident reports, indicating that between April 2000 and December 2003, searches of the San Francisco general jail population resulted in the discovery of 1,574 items of contraband, including 662 assorted controlled substance pills, 106 shanks and other weapons, 1 screwdriver, 17 jail-made handcuff keys, 42.88 grams of rock cocaine, 2.75 grams of powder cocaine, 6.70 grams of methamphetamine, 6.24 grams of tar heroine, 71.93 grams of marijuana, 4 ecstasy pills, 32 assorted pipes, 1 hypodermic needle, and 24 gallons of homemade alcohol known as "Pruno." The presence of such contraband threatens the health and safety of inmates, corrections officers, and jail employees. The record contains reports of the death of an inmate housed in the general population from drugs obtained within the prison, and of one detainee who set her clothes on fire with a lighter smuggled into the cell, of another who mutilated himself with staples similarly secreted into the jail, and of a third who attempted suicide with razor-blades smuggled into the jail in his rectal cavity. The jail administrators have concluded that, based on their experience, "the greatest opportunity for the introduction of drugs and weapons into the jail occurs at the point when an arrestee is received into the jail for booking and, thereafter, housing." In light of this conclusion, Sheriff Hennessey developed and implemented a "Booking Searches" policy. This policy authorized officers to strip search an arrestee when any one of eleven conditions applied, including the condition at issue here, namely, when "[a] person [was] assigned a custody level by Classification and scheduled for custodial housing."

Plaintiffs' facial challenge to the Booking Searches policy is the only issue before us in this interlocutory appeal. This is an important point, because the dissent draws upon unproven allegations to give a shocking and inflammatory account of

mistreatment by jail officials, including forcible strip searches conducted in an abusive and violent manner. The dissent's sensationalist account of individual factual allegations is worse than irrelevant, as it invites us to decide this case on the basis of disputed factual issues not yet presented by the parties, not yet considered by the district court, and not yet weighed by a jury. San Francisco has vigorously denied the allegations the dissent recites. Nevertheless, if true, these allegations are quite serious, even absent the dissent's embellishments.[2] Such abuses would contravene San Francisco's written policy, which required that searches be conducted in a "professional manner," and prohibited officers of the opposite sex to be present. If these allegations were found to be true, the victims of those abuses would have strong claims against San Francisco.

But the plaintiffs are not making such claims. Plaintiffs emphasized throughout their briefing that they "brought this action to challenge the blanket policy and practice of searching prearraignment arrestees . . . ," not the individual cases. Thus, plaintiffs relied "almost exclusively on defendants' depositions and written policies as the basis of the material facts" in order to avoid disputed issues of fact that would defeat summary judgment.

For purposes of this narrow appeal, we are called upon to assess the constitutionality of the policy itself, not violations of that policy; thus, as did the district court, we must assume the challenged policy was followed scrupulously.

Although the dissent's dramatic accounts stir the emotions, they are misleading and ultimately irrelevant to the case before us. Not a single one of the long parade of victims described by the dissent—Mary Bull, Charli Johnson, Bernie

---

[2]There is no doubt, as the Court stated in *Bell*, that "on occasion a security guard may conduct the search in an abusive fashion," and "[s]uch an abuse cannot be condoned." 441 U.S. at 560.

Galvin, Michael Marron, Laura Timbrook, Salome Mangosing, Leigh Fleming, Michelle De Ranleau, or Deborah Flick —have claims at issue in this appeal.[3] Rather than highlight the dramatic individual anecdotes that can be mined from the record, we limit our discussion to the issue actually before us: plaintiffs' challenge to the jail's written strip-search policy. We leave other, factual questions to be addressed by the district court in the first instance.

## A

During the period at issue, new arrestees entering the San Francisco County jail system were transported to County Jail No. 9, a temporary intake and release facility, where they were pat-searched, scanned with a metal detector, booked into the system, and fingerprinted. The arrestees were then placed in holding cells. Those eligible to post bail were given access to a telephone and afforded up to 12 hours to secure their release on bond. Individuals arrested because of intoxication were released when they became sober. Arrestees who were statutorily eligible were cited and released. *See* Cal. Penal

---

[3]The claims of each of these individuals have been judicially resolved in some manner, and are not on appeal here. For example, the district court recognized that "substantial evidence in the record" supported a finding that "reasonable suspicion existed to strip search" Bull and Mangosing, and thus denied summary judgment to them on their individual claims. Plaintiffs conceded that all of Johnson's claims were time-barred, and did not oppose summary judgment in San Francisco's favor. San Francisco did not oppose summary judgment in favor of Timbrook. The district court granted summary judgment in favor of Sheriff Hennessey on the claims of Fleming and Flick, who were searched, like Bull and Mangosing, only pursuant to the "safety cell" policy. Under this policy, inmates or arrestees "were subjected to blanket visual body cavity search(es) incident to placement in a 'safety cell' at any of the San Francisco County jails." The district court held that Sheriff Hennessey had qualified immunity from challenges to that policy. Galvin, Marron, and De Ranleau are not even plaintiffs in this action, and, accordingly, are never mentioned in plaintiffs' summary-judgment papers; they appear in a proposed Second Amended Complaint, which was rejected by the district court.

Code § 853.6. None of these arrestees was strip searched under the challenged policy.

Because County Jail No. 9 is a temporary intake facility equipped with holding cells but no beds, those arrestees not eligible for release were transported to a jail with housing facilities. Arrestees were then transferred into the facility's general jail population, which included pretrial detainees and convicted inmates. Pursuant to the Booking Searches policy, these individuals were strip searched prior to admission into the general population in order to prevent the smuggling of contraband into the facilities.

Under the policy, a strip search was to be performed "in a professional manner in an area of privacy" by an officer of the same sex as the arrestee. The arrestee was required "to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the underclothing, breasts, buttocks or genitalia of such person." The search included "a visual inspection of the mouth, ears, hair, hands, skin folds, [and] armpits as well as a thorough search of all clothing items." San Francisco Sheriff's Dep't Proc. No. E-03, E-03(III).[4]

---

[4]The written policy instructions for conducting strip searches stated:

1. Strip searches include a visual body cavity search. A strip search *does not* include a physical body cavity search.

2. The search will be conducted in a professional manner in an area of privacy so that the search cannot be observed by persons not participating in the search.

3. The searching officer will instruct the arrestee to:

   a. Remove his/her clothing.

   b. Raise his/her arms above their head and rotate 360 degrees.

   c. To bend forward and run his/her hands through his/her hair.

   d. To turn his/her head first to the left and then to the right so the searching officer can inspect the arrestee's ear orifices.

The policy authorized a visual search only; officers were not allowed to physically touch inmates' body cavities.

Strip searches conducted under the Booking Searches policy uncovered significant amounts of contraband hidden in and on arrestees' bodies. For example, as noted by the district court, San Francisco "produced evidence that from April 2000 through April 2005 strip searches at County Jail No. 9 resulted in the discovery of 73 cases of illegal drugs or drug paraphernalia hidden in body cavities." Contraband discovered in arrestees' body cavities included handcuff keys, syringes, crack pipes, heroin, crack-cocaine, rock cocaine, and marijuana. In the same time period, strip searches uncovered various concealed weapons, including a seven-inch folding knife, a double-bladed folding knife, a pair of 8-inch scissors, a jackknife, a double-edged dagger, a nail, and glass shards. Jail officials found contraband on arrestees charged with a range of offenses, including non-violent offenses such as public drunkenness, public nuisance, and violation of a court order. For example, a man arrested on a warrant for public nuisance was found smuggling a plastic bag of suspected cocaine powder. The parties dispute whether any discovery of contraband can be conclusively tied to class members, but, as

---

    e.   To open his/her mouth and run his/her finger over the upper and lower gum areas; then raise his/her tongue so the officer can inspect the interior of the arrestee's mouth. Remove dentures if applicable.

    f.   To turn around and raise first one foot, then the other so the officer can check the bottom of each foot.

4.   The searching officer will visually inspect the arrestee's breasts, buttocks, and genitalia.

5.   The searching officer will thoroughly search the arrestee's clothing, underclothing, shoes, and socks.

6.   At the completion of the search, the searching officer will instruct the arrestee to dress.

discussed below, a resolution of this dispute is not material to our holding today.

B

In April 2003, Mary Bull and a class of similarly situated plaintiffs filed a class action complaint under 42 U.S.C. § 1983 in district court against the City and County of San Francisco, the Sheriff's Department, Sheriff Hennessey in his individual and official capacities, and certain unnamed Sheriff's deputies. Plaintiffs alleged that San Francisco's strip search policy violated their Fourth Amendment right to be free from unreasonable searches and their Fourteenth Amendment rights to due process and privacy.[5]

In an order issued June 10, 2004, the district court granted plaintiffs' motion to certify a class under Federal Rule of Civil Procedure 23(b)(3) and defined the class as including all persons who "were arrested on *any* charge *not* involving weapons, controlled substances, or a charge of violence, and *not* involving a violation of parole or a violation of probation (where consent to search is a condition of such probation), *and* who were subjected to a blanket visual body cavity strip search by defendants before arraignment at a San Francisco County jail facility without any individualized reasonable suspicion that they were concealing contraband."[6]

In June 2005, plaintiffs moved for partial summary judgment on their claims that San Francisco's former strip search policy was facially unconstitutional with respect to members

---

[5]Plaintiffs also alleged violations of certain provisions of California law that are not at issue in this appeal.

[6]The class also included arrestees who "were subjected to blanket visual body cavity search(es) incident to placement in a 'safety cell' at any of the San Francisco County jails." The validity of the "safety-cell search" policy is not at issue in this appeal. Indeed, as noted *supra*, the district court held that Sheriff Hennessey had qualified immunity from challenges to that policy.

of the class in eight different categories, including arrestees classified for housing in the general jail population. Sheriff Hennessey also moved for partial summary judgment, arguing that he was entitled to qualified immunity with respect to the claim that the strip search policy applicable to persons classified for housing was unconstitutional.

On September 22, 2005, the district court issued an order disposing of the summary judgment motions, but subsequently granted San Francisco's motion for reconsideration. On February 23, 2006, the district court issued an unpublished amended order, granting in part and denying in part each party's motions. *Bull v. City & County of San Francisco*, No. C 03-01840, 2006 WL 449148 (N.D. Cal. Feb. 23, 2006). This order is the subject of our review.[7]

The district court granted plaintiffs' motion for partial summary judgment with respect to the policy of strip searching class members classified for housing, holding that the policy violated those individuals' Fourth Amendment rights. *Id.* at *6. On this issue, the court determined that San Francisco's blanket strip search policy ran afoul of our cases holding that such a search can be conducted only if there is individualized reasonable suspicion that a particular arrestee is concealing contraband, even if the arrestee will be introduced into the general population of a detention facility. *Id.*; *see Thompson*

---

[7]Specifically, on October 21, 2005, San Francisco moved for reconsideration of portions of the district court's September 22, 2005 order that were unrelated to the court's denial of qualified immunity for Sheriff Hennessey. San Francisco simultaneously appealed the denial of qualified immunity to this court, and the appeal was assigned Docket No. 05-17080. On February 23, 2006, the district court issued its amended order. San Francisco again appealed the denial of qualified immunity to this court. This second appeal was assigned Docket No. 06-15566. On April 26, 2006, this court issued an order consolidating appeal Nos. 05-17080 and 06-15566. Because the district court ruled that the February 23, 2006 order superseded its September 22, 2005 order, we dismiss appeal No. 05-17080 as moot.

*v. City of Los Angeles*, 885 F.2d 1439, 1446 (9th Cir. 1989); *Giles v. Ackerman*, 746 F.2d 614, 615 (9th Cir. 1984) (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (en banc).

Accordingly, with regards to that policy, the district court denied Sheriff Hennessey's motion for summary judgment on the ground of qualified immunity. *Bull*, 2006 WL 449148, at *16. The court stated that "[i]t was . . . abundantly clear after *Thompson* that placement in the general jail population 'by itself cannot justify a strip search.' " *Id.* (quoting *Thompson*, 885 F.2d at 1447).[8] Sheriff Hennessey appealed, raising the single issue of this qualified-immunity ruling.

## II

"We review de novo the district court's decision regarding qualified immunity." *Motley v. Parks*, 383 F.3d 1058, 1062 (9th Cir. 2004). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), *overruled on other grounds by Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009)). In applying the two-part qualified immunity analysis, "[w]e must determine whether, taken in the light most favorable to [Plaintiffs], Defendants' conduct amounted to a constitutional violation, and . . . we must determine whether or not the right was clearly established at the time of the violation." *McSherry v. City of Long Beach*, 560 F.3d 1125, 1129-30 (9th Cir. 2009). It is within our "sound discretion [to] decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

---

[8]The court made several other rulings on the parties' cross motions for summary judgment that are not at issue here.

Under the circumstances of this case, we also have jurisdiction to review the district court's grant of partial summary judgment to plaintiffs on the issue of Fourth Amendment liability, because the district court's holding on liability is "inextricably intertwined with," as well as "dependent on both the reasoning and results of," its decision to deny qualified immunity to Sheriff Hennessey. *Marks v. Clarke*, 102 F.3d 1012, 1018 (9th Cir. 1996).

### III

**[1]** The reasonableness of a search is determined by reference to its context. *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). The search policy before us applied to arrestees transferred out of holding cells and introduced into the general jail population for custodial housing. According to San Francisco's unrebutted testimony, the purpose of the strip search policy was to prevent the smuggling of drugs, weapons, and other contraband into the general jail population. Because the purpose of the search policy at issue was to further institutional security goals within a detention facility, the principles articulated in *Bell v. Wolfish*, 441 U.S. 520 (1979), and *Turner v. Safley*, 482 U.S. 78 (1987), govern our analysis. Cases that address searches of arrestees at the place of arrest, searches at the stationhouse prior to booking or placement in a holding cell, or searches pursuant to an evidentiary criminal investigation do not control our review, because housing in the general jail population and the issues attendant to effective detention facility administration are not factors in those cases. Accordingly, we begin our analysis of San Francisco's strip search policy by reviewing the principles established in *Bell* and *Turner*.

### A

In *Bell*, the Supreme Court upheld a policy of conducting visual body cavity searches of individuals housed at Metropolitan Correctional Center (MCC), a federally operated

short-term custodial facility in New York, against Fourth and Fifth Amendment challenges. MCC housed convicted inmates, pretrial detainees, witnesses in protective custody, and persons incarcerated for contempt of court. *Bell*, 441 U.S. at 524. The plaintiff class, consisting of all persons housed at MCC, challenged a number of different "restrictions and practices that were designed to promote security and order at the facility on the ground that these restrictions violated the Due Process Clause of the Fifth Amendment, and certain other constitutional guarantees, such as the First and Fourth Amendments." *Id.* at 544. One of these practices was the requirement that detainees undergo a visual body cavity inspection as part of a strip search "after every contact visit with a person from outside the institution." *Id.* at 558. As in this case, the plaintiffs argued the search policy violated their Fourth Amendment right to be free from unreasonable searches.

Before addressing the merits, the Court reviewed several general principles that informed its analysis, and which bear repeating. First, the Court reaffirmed that prisoners "do not forfeit all constitutional protections" by virtue of incarceration, and stated that pretrial detainees "retain at least those constitutional rights that [the Court] ha[s] held are enjoyed by convicted prisoners." *Id.* at 545. Second, the Court emphasized that the retained constitutional rights of prisoners and detainees alike were subject to restrictions and limitations based on "institutional needs and objectives," explaining that "[t]he fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights." *Id.* at 546. Third, the Court explained that a central justification for this permissible restriction of constitutional rights is a detention facility's need to accomplish the "essential goals" of "maintaining institutional security and preserving internal order and discipline." *Id.* Because "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel," even those restrictions that infringe upon "a specific constitutional

guarantee" must be "evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 547 (internal quotation marks omitted). Finally, the Court directed lower courts to accord corrections officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977); *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989); *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (per curiam); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976)).

The Court specifically rejected the argument that deference to corrections facility officials is necessary only when the persons being housed have been convicted of a crime. *Id.* at 547 n.29. The Court explained that "the principle of deference" to officials' discretion in running corrections institutions is not dependent on the "happenstance" of whether the inmates are pretrial detainees or convicted prisoners. *Id.* Rather, courts owe corrections officials deference on the grounds that "the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch." *Id.*; *see id.* at 547-48.

Turning to the merits, the Court assumed, without deciding, that detainees and inmates "retain some Fourth Amendment rights upon commitment to a corrections facility" and noted that "[t]he Fourth Amendment prohibits only unreasonable searches." *Id.* at 558. The "test of reasonableness . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559.

The Court acknowledged that the scope of the strip searches at MCC was invasive: "If the inmate is a male, he must lift his genitals and bend over to spread his buttocks for visual inspection. The vaginal and anal cavities of female inmates also are visually inspected." *Id.* at 558 n.39. Indeed, the circuit court in *Bell* had invalidated the body cavity search policy, concluding that the " 'gross violation of personal privacy inherent in such a search cannot be outweighed by the government's security interest in maintaining a practice of so little actual utility.' " *Id.* at 558 (quoting *Wolfish v. Levi*, 573 F.2d 118, 131 (2d Cir. 1978)).

The Court rejected this reasoning, however, and held that the strip search policy at MCC was reasonable given the institutional needs and objectives, particularly the security concerns, of the corrections facility. The Court noted that "[c]orrections officials testified that visual cavity searches were necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution." *Id.* Recognizing that a "detention facility is a unique place fraught with serious security dangers," and that "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence," the Court upheld the policy even though there had been no long or pervasive history of smuggling at MCC, nor had corrections officials presented substantial evidence that persons who participated in contact visits were sources of contraband. *Id.* at 559. Indeed, although officials could show only one instance in which contraband was found during a body cavity inspection, the Court found it sufficient that "attempts to secrete these items into the facility by concealing them in body cavities are documented in this record and in other cases." *Id.* (citing cases). While recognizing that the institution might have adopted alternatives less intrusive than a blanket policy of performing strip searches, the Court nevertheless deferred to MCC officials, explaining that the officials' decision to adopt the strip search procedure "has not been shown to be irrational or unreasonable." *Id.* at 559 n.40. Accordingly, the Court con-

cluded the strip search at issue did not violate the detainees' Fourth Amendment rights. *Id.* at 560.

Although *Bell* continues to provide definitive guidance for analyzing detention-facility strip searches under the Fourth Amendment, *Turner v. Safley* is also relevant to our analysis. When reviewing a detention facility's restrictions of constitutional rights that are inconsistent with incarceration, *Turner* directs courts to consider whether the challenged restriction was "reasonably related to legitimate penological interests." 482 U.S. at 89. By considering the reasonableness of a search policy in a detention facility context, we must consider the existence of a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and "the existence of obvious, easy alternatives" as evidence that the regulation "is an 'exaggerated response' to prison concerns." *Id.* at 89-91.[9] With respect to these factors, the Court reiterated the need to defer to "the informed discretion of corrections officials." *Id.* at 90.

We break no new ground in applying *Turner* and *Bell* in this context. *See Thompson v. Souza*, 111 F.3d 694, 699-700 (9th Cir. 1997) (applying *Turner* and *Bell* to a prisoner's Fourth Amendment claim related to visual body cavity and strip searches); *Michenfelder*, 860 F.2d at 332-33 (same); *see also, e.g.*, *Pierce v. County of Orange*, 526 F.3d 1190, 1209 (9th Cir. 2008) (applying *Turner* to pretrial detainees' claims), *cert. denied*, 129 S. Ct. 597 (2008); *Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998) (same).[10] Indeed, *Turner* applies

[9]The second *Turner* factor, "whether there are alternative means of exercising the right that remain open to prison inmates," 482 U.S. at 90, is not applicable to the search policy, because the right to be free from unreasonable searches is not a right susceptible to exercise by alternative means. *See Michenfelder*, 860 F.2d at 331 n.1.

[10]The dissent attempts to distinguish *Thompson* and *Michenfelder* on the ground that they involved "claims brought by prisoners already serving

"to rights that are inconsistent with proper incarceration," *Johnson v. California*, 543 U.S. 499, 510 (2005) (internal quotation marks omitted), and *Bell* made clear that the Fourth Amendment rights of incarcerated persons are subject to "limitation or retraction" in order to maintain institutional security, 441 U.S. at 546; *see also Washington v. Harper*, 494 U.S. 210, 224 (1990) (explaining that *Turner* "made quite clear that the standard of review we adopted . . . applies to all circumstances in which the needs of prison administration implicate constitutional rights").[11]

---

sentences," and thus "involve[d] legitimate penological interests," while such "penological interests" do not apply to pre-trial detainees. This distinction is unavailing. We have never distinguished between pretrial detainees and prisoners in applying the *Turner* test, but have identified the interests of correction facility officials responsible for pretrial detainees as being "penological" in nature. *See, e.g.*, *Simmons v. Sacramento County Superior Court*, 318 F.3d 1156, 1161 (9th Cir. 2003) (holding that a sheriff's refusal to transport a pretrial detainee from jail to court for a personal injury trial "serves a legitimate penological interest" in that it "goes to the very heart of that interest—to keep detainees detained unless absolutely necessary."); *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002) (holding that restrictions on telephone access in a state jail does not violate a pretrial detainee's constitutional rights if "it is reasonably related to legitimate penological interests."). While penological interests in punishment or rehabilitation may not be applicable outside of a prison setting, the penological interest in security and safety is applicable in all correction facilities. Indeed, *Bell* declined to "distinguish[ ] between pretrial detainees and convicted inmates in reviewing the challenged security practices," noting that "[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates. Indeed, it may be that in certain circumstances they present a greater risk to jail security and order." *Bell*, 441 U.S. at 547 n.28.

[11]The dissent argues that we should not apply the *Turner* standard, because "*Bell* directly controls here." While we agree that Bell is directly applicable to pretrial detainees, *Bell* is consistent with *Turner*, *see Turner*, 482 U.S. at 87-90; *Thornburgh*, 490 U.S. at 410 n.9 (pointing out that *Turner* "expressly relied" on *Bell* "when it announced the reasonableness standard for 'inmates' constitutional rights' cases"), and thus there is no reason to depart from our prior cases holding that *Turner* is applicable in this context.

B

**[2]** Turning to the San Francisco strip search policy, we begin by applying *Bell*'s general principles. *Bell* held that a mandatory, routine strip search policy applied to prisoners "after every contact visit with a person from outside the institution," without individualized suspicion, was facially constitutional. The dissent's characterization of the case to the contrary is counterfactual. *See Bell*, 441 U.S. at 558. In reaching this conclusion *Bell* assumed, without deciding, that incarcerated persons retain some Fourth Amendment rights. We have gone further, and recognized that the Fourth Amendment does apply to the invasion of bodily privacy in prisons. *See, e.g.*, *Michenfelder*, 860 F.2d at 332. Because San Francisco's policy applied to arrestees introduced into the general jail population for custodial housing, we are required to evaluate the plaintiffs' constitutional claims "in the light of the central objective of prison administration, safeguarding institutional security." *Bell*, 441 U.S. at 547. The principle that confinement "brings about the necessary withdrawal or limitation of many privileges and rights . . . applies equally to pretrial detainees and prisoners." *Bell*, 441 U.S. at 545-46 (internal quotation marks omitted); *see also United States v. Van Poyck*, 77 F.3d 285, 291 & n.10 (9th Cir. 1996). Finally, even if we "disagree[ ] with the judgment of [corrections] officials about the extent of the security interests affected and the means required to further those interests," *Bell*, 441 U.S. at 554, we may not engage in "an impermissible substitution of [our] view on the proper administration of [a corrections facility] for that of the experienced administrators of that facility." *Block*, 468 U.S. at 589.

**[3]** Applying the principles reviewed above, it is apparent that the scope, manner, and justification for San Francisco's strip search policy was not meaningfully different from the scope, manner, and justification for the strip search policy in *Bell*.[12] Similar to the challenged policy in *Bell*, the San Fran-

---

[12]*Bell* did not analyze the place in which the strip searches occurred, but as explained below, the San Francisco policy's requirement that officers

cisco strip search procedures governing the scope and manner of the searches, as detailed in the Sheriff's Booking Searches policy, limited the searches to visual inspection and expressly prohibited tactile strip searches. *See* 441 U.S. at 558 n.39, 560. Moreover, the San Francisco procedures required officials to conduct strip searches in a professional manner and in a place that afforded privacy. Furthermore, the circumstances justifying the San Francisco strip search policy are weightier in this case than they were in *Bell*. The record reveals a pervasive and serious problem with contraband inside San Francisco's jails, as well as numerous instances in which contraband was found during a search, indicating that arrestees' use of body cavities as a method of smuggling drugs, weapons, and items used to escape custody is an immediate and troubling problem for San Francisco jail administrators. The record of smuggling in this case far exceeds the showing in *Bell*, where defendants "proved only one instance in the MCC's short history where contraband was found during a body-cavity search." *Id.* at 558.

**[4]** In sum, because the circumstances before us are not meaningfully distinguishable from those presented in *Bell*, the balance between the need for the San Francisco strip search policy and "the invasion of personal rights that the search entails" must be resolved in favor of the jail system's institutional concerns. *Id.* at 559. While strip searches are invasive and embarrassing, and while this type of security measure "instinctively gives us the most pause," *id.* at 558, we must conclude that under *Bell*, San Francisco's strip search policy was reasonable and therefore did not violate the class members' Fourth Amendment rights.

**[5]** Because the *Turner* factors require us to give more deference to detention officials' determinations than does the bal-

---

conduct strip searches in a private place supports a conclusion that the policy was reasonable.

ancing test in *Bell*, it is not surprising that our consideration of the *Turner* factors leads to the same conclusion. San Francisco presented a well-documented record of the contraband problem in its jails, of individuals attempting to smuggle contraband into the jails via body cavities, and of the health and safety issues such smuggling raised. The record includes a jail administrator's testimony that "it is of utmost importance in the operation of a jail system to prevent the introduction of drugs, weapons, and other contraband" and that "[t]he safety and well being of all inmates, staff and the public demands no less." Further, Sheriff Hennessey testified that, in creating jail policies, he considers "the needs of institutional security and safety of staff, inmates, and visitors[,] . . . the privacy and dignity of inmates[,] . . . [and] the cost and practicality of jail policies." Finally, the record includes testimony that "the greatest opportunity for the introduction of drugs and weapons into the jail occurs at the point when an arrestee is received into the jail for booking and, thereafter, housing," and that detainees "are searched before they are transferred to the general jail population in order to prevent the introduction of drugs, weapons or other contraband into the jails and thereby to protect inmates and staff." In light of this evidence, we must conclude there was a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (internal quotation marks omitted); *see Beard v. Banks*, 548 U.S. 521, 531 (2006) (holding that detention facility superintendent's testimony articulating identified problem and his views on how challenged policy addressed them was sufficient to show "that the regulations do, in fact, serve the function identified").

[6] With respect to *Turner*'s concern for prison resources, San Francisco produced undisputed evidence that the elimination of the strip search policy would "lead to a higher incidence of illegal contraband in the jails," and that implementation of more targeted policies "requires supervisory and line staff training" that "takes time away from other

tasks and necessarily uses resources in scarce supply." When the allocation of resources and the ability of administrators to protect staff and detainees at the facility are at issue, "courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90.[13] Moreover, because *Bell* determined that a strip search policy is reasonable in a facility with only a single confirmed smuggling incident, 441 U.S. at 559, we cannot say that plaintiffs have met their burden of showing that San Francisco's strip search policy was "an exaggerated response to prison concerns," *Turner*, 482 U.S. at 90 (internal quotation marks omitted). Furthermore, eligible arrestees who were released following citation, upon reaching sobriety, or after posting bond were not subject to strip searches, and San Francisco gave arrestees a reasonable time in which to post bond. Finally, in light of the documented evidence of the ongoing, dangerous, and perplexing contraband-smuggling problem, and given the deference we owe to jail officials' professional judgment, we cannot conclude that there are "obvious, easy alternatives" to preventing contraband from entering the jails. *Turner*, 482

---

[13]The dissent claims San Francisco instituted its policy merely because it would require more time to train its officers and because "it is administratively inconvenient to comply with the Constitution." It cites *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973), for the proposition that "mere bureaucratic discomfort does not justify constitutional violations." *Frontiero* is not on point. In *Frontiero*, the Court struck down a statute that discriminated on the basis of gender and held that the government's justification for the statute, that it would be "cheaper and easier" to discriminate, did not pass strict scrutiny review. *Frontiero*, 411 U.S. at 691. In the corrections facility context, by contrast, the Supreme Court requires courts to inquire into "the impact accommodation of the asserted constitutional right will have on . . . the allocation of prison resources generally" in order to determine whether there is a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89-90. San Francisco's statements regarding the effect that the implementation of a targeted strip search policy would have on jail resources is relevant to this inquiry, and the dissent's claim that such statements represent San Francisco's view that it would be "administratively inconvenient to comply with the Constitution" misrepresents the record.

U.S. at 90. Accordingly, a straightforward application of *Tur-ner* likewise leads to the conclusion that San Francisco's strip search policy did not violate the class members' Fourth Amendment rights because it was "reasonably related to [the] legitimate penological interests" of the jail in maintaining security for inmates and employees by preventing contraband smuggling. *Id.* at 89.

C

**[7]** Plaintiffs argue this conclusion is inconsistent with our earlier decisions in *Thompson v. City of Los Angeles*, 885 F.2d 1439 (9th Cir. 1989), and *Giles v. Ackerman*, 746 F.2d 614 (9th Cir. 1984) (per curiam), which held that a blanket policy of strip searching arrestees was per se unconstitutional, even if the arrestees were to be transferred into the general population. In revisiting these opinions today, we conclude they failed to give due weight to the principles emphasized in *Bell* and reiterated in *Turner*.

In *Giles*, a woman arrested for a minor traffic offense was strip searched in accordance with county policy before being booked at the county jail. We concluded that "arrestees charged with minor offenses may be subjected to a strip search only if jail officials possess a reasonable suspicion that the individual arrestee is carrying or concealing contraband." 746 F.2d at 617. Because the county lacked such a reasonable suspicion in Giles's case, we held the strip search violated her constitutional rights. We distinguished the facts of Giles's case from the situation in *Bell* on several grounds. First, we determined that a strip search of every arrestee booked into a county jail was "not necessary to protect the institution's security interest," in part because arrestees could be segregated from more dangerous inmates. *Id.* We refused to accord weight to the fact Giles had been placed in the general jail population, reasoning that "such intermingling is both limited and avoidable." *Id.* at 618-19. Second, we stated that the detainees in *Bell* "were charged with offenses more serious

than minor traffic violations, and . . . they were therefore detained for substantial pretrial periods." *Id.* at 617. Third, we noted the county had not demonstrated that the jail had a serious smuggling problem, because only eleven incidents of smuggling had been detected in the preceding eighteen-month period. *Id.* Finally, we determined the county had not demonstrated that its strip search policy had a deterrent effect, reasoning "[v]isitors to the detention facility in *Bell* could plan their visits and organize their smuggling activities," whereas confinement in the county jail was an unplanned event, "so the policy could not possibly deter arrestees from carrying contraband." *Id.*

In *Thompson*, we upheld the constitutionality of the county's strip search of a man arrested for grand theft auto because his offense was "sufficiently associated with violence to justify a visual strip search." 885 F.2d at 1447. Following *Giles*, we confirmed that strip searches must be based on individualized reasonable suspicion that an arrestee is carrying contraband, and cannot be justified on the ground that an arrestee is being placed in contact with the general jail population. *Id.*

*Thompson* and *Giles* failed to comply with the Supreme Court's direction that we not substitute our judgment for that of corrections facility officials. *Bell*, 441 U.S. at 540 n.23. First, our conclusion in *Giles* that strip searches of arrestees heading into the general jail population must be based on individualized suspicion is inconsistent with the approach adopted in *Bell*. The Supreme Court did not require MCC officials to consider the individual characteristics of the persons subject to the strip search policy. Nor did the Court require MCC officials to articulate their suspicions that a particular person subject to the policy was smuggling contraband. Rather, the Supreme Court upheld a policy of strip searching all persons who had contact visits as categorically reasonable under the circumstances in the detention facility. *Id.* at 559-60; *see Hudson v. Palmer*, 468 U.S. at 538 (O'Connor, J., concurring) (stating that in certain contexts, such as the one considered in

*Bell*, "the Court has rejected the case-by-case approach to the 'reasonableness' inquiry in favor of an approach that determines the reasonableness of contested practices in a categorical fashion" (citing *Bell*, 441 U.S. at 555-60)); *see also Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619-20 (1989) (describing special needs cases and citing *Bell*). Moreover, the question whether strip searches could be justified even in the absence of individualized suspicion was squarely raised in *Bell*. *See* 441 U.S. at 563 (Powell, J., concurring in part and dissenting in part) (dissenting on the sole ground that "at least some level of cause, such as a reasonable suspicion, should be required to justify the anal and genital searches described in this case"); *id.* at 578 (Marshall, J., dissenting) (disagreeing with the majority in part on the ground that "the searches are employed absent any suspicion of wrongdoing"). Yet the Court declined to impose an individualized suspicion requirement, notwithstanding criticism from Justices Powell and Marshall.

Second, we erred in concluding that arrestees charged with minor offenses "pose no security threat to the facility." *Giles*, 746 F.2d at 618.[14] *Bell* did not require MCC officials to modify the strip search policy based on whether a detainee had been charged with a serious or minor offense. Indeed, the detention facility in *Bell* housed witnesses in protective custody and persons detained pursuant to contempt orders, and those persons were included in the class of plaintiffs. 441 U.S. at 524, 526 n.5; *see also United States ex rel. Wolfish v. Levi*, 439 F. Supp. 114, 119 (S.D.N.Y. 1977) (defining the class of plaintiffs as "pre-trial detainees for whom the facility was primarily designed, sentenced prisoners either awaiting assign-

---

[14]The dissent repeats this error in asserting that "persons with no criminal history arrested for trivial offenses pose no credible risk of smuggling contraband into jails." As in *Giles*, this appellate fact finding constitutes the "sort of unguided substitution of judicial judgment for that of the expert prison administrators" the Supreme Court has forbidden. *Bell*, 441 U.S. at 554.

ment to a prison facility or assigned here to serve their (usually relatively short) terms, prisoners here on writs to testify or to stand trial, witnesses in protective custody, and persons incarcerated for contempt"). "The MCC was hardly a facility where all of the detainees were 'awaiting trial on serious federal charges,' as some of the opinions of other circuits seem to indicate." *Evans v. Stephens*, 407 F.3d 1272, 1291 (11th Cir. 2005) (en banc) (Carnes, J., concurring specially).

Third, *Giles* erred in deciding that a record of eleven instances of smuggling was insufficient to demonstrate a smuggling problem. 746 F.2d at 617-18. *Bell* did not require officials to demonstrate a lengthy history of multiple incidents of smuggling. Rather, in *Bell*, MCC officials had determined that, in their professional judgment, strip and visual cavity searches after contact visits were necessary for deterrence as well as detection of contraband. 441 U.S. at 558. In light of this decision, which was not "irrational or unreasonable," *id.* at 559 n.40, the Supreme Court held MCC's strip search policy was constitutional even though MCC had detected just a single incident of contraband smuggling, *id.* at 559; *see also Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 675 n.3 (1989) ("When the Government's interest lies in deterring highly hazardous conduct, a low incidence of such conduct, far from impugning the validity of the scheme for implementing this interest, is more logically viewed as a hallmark of success." (citing *Bell*, 441 U.S. at 559)).[15]

---

[15]Thus, the dissent's argument that *Bell* requires a "factbound, data-driven inquiry into the categorical reasonableness of the search" mischaracterizes the Court's holding. In overruling the district court and the Second Circuit, *Bell* rejected the empirical evidence requirement adopted by those courts, *see Wolfish*, 439 F. Supp. at 147; *Wolfish*, 573 F.2d at 131, and upheld MCC's strip search policy even though there had been only one incident of prior contraband smuggling. Indeed, Bell suggested that the strip search policy would have been valid in the absence of any proof of incidents of contraband smuggling, because the absence of contraband may indicate that the policy is an effective deterrent. *Bell*, 441 U.S. at 559 ("That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.").

Finally, *Giles* erred in assuming that a strip search policy could not have a deterrent effect on persons who have been arrested and are being introduced into the general jail population for the first time, 746 F.2d at 617, as opposed to detainees who are already in the general jail population and are engaging in contact visits. In both scenarios, the individuals have access to contraband and can conceal dangerous items on their person. "There is no denying that arrestees entering a detention facility usually have had plenty of contact with outsiders, most having been outsiders themselves until they were arrested." *Powell v. Barrett*, 541 F.3d 1298, 1313 (11th Cir. 2008) (en banc). Thus, the effort to distinguish *Bell* on the ground that "arrestees do not ordinarily have notice that they are about to be arrested and thus an opportunity to hide something," *Shain v. Ellison*, 273 F.3d 56, 64 (2d Cir. 2001), and therefore are less likely to hide contraband on their person than persons already in jail who engage in contact visits, is unpersuasive.[16] As the Eleventh Circuit noted, "[n]ot everyone who is arrested is surprised, seized, and slapped into handcuffs without a moment's notice. Some people surrender when they are notified that a warrant for them is outstanding. . . . [Some] have notice that officers are coming to arrest them," and those persons arrested after a vehicle stop "may have time to hide items on their person before the officer reaches the car door. Then there are those who deliberately get themselves arrested." *Powell*, 541 F.3d at 1313.

*Giles*'s hypothesis that arrestees lack the opportunity to hide contraband on their person is also belied by the evidence in this case. The record establishes that San Francisco detected a substantial amount of contraband during strip

---

[16]Although the dissent argues that "[a]s a matter of common sense, contact visits are far more likely to lead to smuggling than initial arrests," it offers no support for this factual finding. *But see Bell*, 441 U.S. at 547 (holding that courts should accord "wide-ranging deference" to prison administrators' judgment of the practices and policies needed to "preserve internal order and discipline and to maintain institutional security").

searches of arrestees at the San Francisco jail, and also indicates that arrestees facing a strip search have jettisoned contraband in the holding cell. This evidence shows that arrestees do, in fact, have both the opportunity and inclination to conceal contraband in private bodily areas before being transported to County Jail No. 9, and that a strip search policy may have a deterrent effect. Because we see no meaningful difference between the institutional concerns raised by contact visits in *Bell* and those raised by introducing arrestees into the general jail population in this case, we must reject this purported distinction of *Bell*.

For the same reasons, we disagree with those other circuits that have held strip searches of arrestees entering the general jail population per se unreasonable unless the officials have individualized reasonable suspicion that the arrestees are smuggling contraband. *See, e.g.*, *Roberts v. Rhode Island*, 239 F.3d 107, 112 (1st Cir. 2001); *Shain*, 273 F.3d at 65; *Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989). These courts have purported to distinguish *Bell* on several grounds: that persons arrested on certain minor offenses do not represent a security concern, *see, e.g.*, *Roberts*, 239 F.3d at 111, *Masters*, 872 F.2d at 1255; that persons who are arrested are less likely to smuggle contraband than detainees already in the general jail population who engage in contact visits, *see, e.g.*, *Roberts*, 239 F.3d at 112; and that a blanket strip search policy for all arrestees entering the general jail population is unreasonable unless officials have demonstrated the existence of a significant smuggling problem and that a blanket policy has a significant deterrent effect, *see, e.g.*, *id.* As explained above, this reasoning is inconsistent with both the general principles enunciated in *Bell* and *Turner*, and with the specific application of those principles to the strip search at issue in *Bell*. Moreover, these decisions are inconsistent with the Supreme Court's warning that federal courts must avoid substituting their judgment for the "professional expertise of corrections officials" in "determining whether restrictions or conditions are reasonably related to the Government's interest in main-

taining security and order and operating the institution in a manageable fashion." 441 U.S. at 540 n.23. While federal courts may "disagree[ ] with the judgment of [corrections] officials about the extent of the security interests affected and the means required to further those interests," the Supreme Court's "decisions have time and again emphasized that this sort of unguided substitution of judicial judgment for that of the expert prison administrators on matters such as this is inappropriate." *Id.* at 554.

**[8]** We agree with the reasoning of the Eleventh Circuit that the rights of arrestees placed in custodial housing with the general jail population "are not violated by a policy or practice of strip searching each one of them as part of the booking process, provided that the searches are no more intrusive on privacy interests than those upheld in the *Bell* case," and the searches are "not conducted in an abusive manner." *Powell*, 541 F.3d at 1314; *cf. Archuleta v. Wagner*, 523 F.3d 1278, 1284 (10th Cir. 2008) (upholding searches of arrestees intermingled with general population of a corrections facility, but not those awaiting bail, and stating that when an arrestee is kept in a holding cell the "obvious security concerns inherent in a situation where the detainee will be placed in the general prison population are simply not apparent"). We therefore overrule our own panel opinions in *Thompson* and *Giles*.

**[9]** We do not, however, disturb our prior opinions considering searches of arrestees who were not classified for housing in the general jail or prison population.[17] *See, e.g.*, *Way v.*

---

[17]Thus the dissent misrepresents the reach of the San Francisco policy and our holding in claiming that we are "sweep[ing] away twenty-five years of jurisprudence," and "giving jailors the unfettered right" to search "any citizen who may be arrested for minor offenses." The strip search policy at issue in this case, and our holding today, applies only to detainees classified to enter the general corrections facility population. The dissent fails to differentiate between cases considering the constitutionality of strip searches of arrestees who were classified for housing in the general population, and strip searches of arrestees in other contexts.

*County of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006) (considering the strip search of an intoxicated arrestee who was detained until sober and never housed with the general jail population); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993) (considering the strip search of arrestees who were cited and released); *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1445-46 (9th Cir. 1991) (considering the search of arrestees without considering whether they would be held in the general jail population); *Kennedy v. L.A. Police Dep't*, 901 F.2d 702, 712 (9th Cir. 1990) (considering the strip search of an arrestee who was placed in a holding cell until posting bond); *Ward v. County of San Diego*, 791 F.2d 1329, 1333 (9th Cir. 1986) (considering the strip search of an arrestee who was searched before the determination was made as to whether she was eligible for release on her own recognizance). The constitutionality of searches of arrestees at the place of arrest, searches at the stationhouse prior to booking, and searches pursuant to an evidentiary investigation must be analyzed under different principles than those at issue today. *See, e.g.*, *Winston v. Lee*, 470 U.S. 753, 762-63 (1985) (analyzing a physically invasive search of an arrestee intended to uncover vital evidence in criminal investigation); *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983) (addressing inventory searches at the stationhouse intended to avoid theft, ascertain identity, and maintain security in a police station); *United States v. Robinson*, 414 U.S. 218, 235 (1973) (discussing searches incident to lawful arrest, which are "based upon the need to disarm and to discover evidence"); *see also Evans*, 407 F.3d at 1279.

## D

In rejecting our analysis, the dissent devises its own test for determining whether the strip search of an arrestee is constitutional. First, the dissent contends that "strip searches must be justified by individualized reasonable suspicion" or, at the very least, "categorical reasonableness based on empirical evidence that the policy is necessary." The categorical

approach must be "narrowly tailored" because "the most invasive search is justified only by the most compelling need."[18]

Ultimately, the dissent's analysis and proposed test amount to a disagreement with *Bell*. Under *Bell*, as explained above, a strip search policy in these circumstances need not be based on individualized reasonable suspicion or empirical evidence that the policy is necessary. In fact, the MCC's strip search policy would probably not pass muster under the dissent's test. The MCC's policy was not supported by empirical data: The MCC proved "only one instance . . . where contraband was found during a body-cavity search." *Bell*, 441 U.S. at 558. Nor was there evidence that the contraband was found on a person who might meet the dissent's standard for raising reasonable suspicion to justify a search. *Id.* at 559. Under *Bell*, the question (disputed by the parties) whether there is an "example of anyone from the class defined by the district court who was found to possess contraband upon being strip searched" is not dispositive, or even relevant. As the dissent acknowledges, "*Bell* directly controls here." *Bell* is inconsis-

---

[18]The dissent attempts to support this test by pointing to Supreme Court decisions that are considerably far afield from the situation here. For example, it cites *Safford Unified School District #1 v. Redding*, 129 S. Ct. 2633 (2009), to support its theory that "a strip search policy violates the Fourth Amendment when there is little evidence that the searches will result in the discovery of contraband." As the dissent acknowledges, this decision arose in a "slightly different context." Specifically, Safford addressed the rights of school children, and "it goes almost without saying that the prisoner and the schoolchild stand in wholly different circumstances." *New Jersey v. T.L.O.*, 469 U.S. 325, 338 (1985) (internal quotation marks and alteration omitted). As the Court remarked, "[w]e are not yet ready to hold that the schools and the prisons need be equated for purposes of the Fourth Amendment." *Id.* at 338-39. The considerations that informed the Court's analysis in *Safford* are not applicable here. The dissent also cites the Supreme Court's standard for demonstrating the existence of probable cause when applying to a magistrate for a warrant. Of course, corrections officials do not need probable cause and a warrant in order to conduct searches related to institutional security. *See, e.g., Hudson*, 468 U.S. at 538 (O'Connor, J., concurring); *Bell*, 441 U.S. at 560.

tent with the dissent's analysis, and compels the conclusion we reach in this case. We must therefore reject the dissent's approach for determining the constitutionality of strip searches of detainees entering the general population of a corrections facility.

IV

**[10]** In light of governing Supreme Court precedent, and given the circumstances presented here, we conclude that San Francisco's policy requiring strip searches of all arrestees classified for custodial housing in the general population was facially reasonable under the Fourth Amendment, notwithstanding the lack of individualized reasonable suspicion as to the individuals searched. Because the policy did not violate plaintiffs' Fourth Amendment rights, we reverse the district court's denial of Sheriff Hennessey's motion for summary judgment based on qualified immunity, and in doing so necessarily reverse the district court's grant of plaintiffs' motion for partial summary judgment as to Fourth Amendment liability.

**REVERSED.**

---

KOZINSKI, Chief Judge, with whom Judge GOULD joins, concurring:

The interesting and difficult question at the heart of this case is whether federal judges can force government officials to subdivide classes of people subject to a valid Fourth Amendment search into sub-classes that present a materially different Fourth Amendment calculus. That question can arise in many contexts, and the answer will have far-reaching consequences.

There was a time in our constitutional history when one might have argued that the Fourth Amendment requires indi-

vidualized suspicion for every search and an appropriate constitutional balance as to each individual. If that was ever the case, it's not so now: The government is entitled to search classes of individuals based on a balance struck for the class as a whole, regardless of whether there's reasonable suspicion —or any suspicion at all—as to any particular member. *Bell* v. *Wolfish* tells us that everyone in prison who participates in a contact visit may be strip searched. 411 U.S. 520, 558-60 (1979). We've known for some time that everyone who boards a commercial airplane may be subject to a fairly intrusive search, *United States* v. *Edwards*, 498 F.2d 496, 500 (2d Cir. 1974) (Friendly, J.), as may everyone who enters a public building, *McMorris* v. *Alioto*, 567 F.2d 897, 900-01 (9th Cir. 1978) (Kennedy, J.). We've said that truck drivers can be searched without individual suspicion. *Int'l Brotherhood of Teamsters* v. *Dep't of Transp.*, 932 F.2d 1292, 1300 (9th Cir. 1991). And the Supreme Court has approved such suspicionless searches for railroad workers, *Skinner* v. *Ry. Labor Executives Ass'n*, 489 U.S. 602, 624 (1989), student athletes, *Vernonia Sch. Dist. 47J* v. *Acton*, 515 U.S. 646, 665 (1995), students participating in other extracurricular activities, *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County* v. *Earls*, 536 U.S. 822, 838 (2002), customs agents, *Nat'l Treasury Employees Union* v. *Von Raab*, 489 U.S. 656, 677 (1989), prisoners released on parole, *Samson* v. *California*, 547 U.S. 843, 846 (2006), and people crossing the border, *United States* v. *Martinez-Fuerte*, 428 U.S. 543, 545 (1976).

The class to be searched is generally defined by the activity in question: In *Bell*, it was the class of all inmates who had contact visits; in other situations it's all those who seek to board an aircraft, enter a building, drive a truck, perform certain law enforcement functions or engage in particular extracurricular activities. In a very important sense, such classifications trade the protection afforded by individualized suspicion for protection derived from the fact that the government treats all similarly situated people in precisely the same way.

Which brings us to the hard question: Do individuals subject to class-wide search based on risks attributable to the class as a whole have a constitutional right to get themselves certified as a sub-class as to which a lesser search, or no search at all, is reasonable? For example, should some people be exempt from the inconvenience and delay of airport searches because they belong to a sub-class that has a materially lower likelihood of hijacking a plane—e.g. the class of federal judges nominated by the President and confirmed by the Senate? Or should certain individuals who enter public buildings be exempt from search because they belong to a learned profession and therefore present a lower risk? *Compare Klarfeld* v. *United States*, 944 F.2d 583, 588 (9th Cir. 1991) (Pregerson, J., concurring in the result), *with Klarfeld*, 962 F.2d 866, 870 (9th Cir. 1992) (Kozinski, J., dissenting from denial of rehearing en banc). This question could be posed multiple times for any regime where searches are authorized based on suspicion applicable to a class—by truck drivers with exemplary driving records; customs agents who have never been subject to discipline; high school football players who maintain a B+ average (few); prison inmates convicted of genteel crimes; the list is endless.

The Supreme Court has held that individuals are sometimes entitled to an individualized Fourth Amendment calculus, and at other times they're entitled to a class-wide calculus. *See, e.g.*, *Skinner*, 489 U.S. at 624. But it has never held that they're entitled to carve out a sub-class as to which a different Fourth Amendment balance must be struck. In the absence of Supreme Court guidance, I am reluctant to take that step. I can think of at least three reasons, all illustrated by this case, why it might not be such a swell idea.

First, there's a degree of subjectivity that attends any classification, and that subjectivity can easily transform into elitism. It's no coincidence, I believe, that the class of people selected for favorable treatment by the district court in this case are those who have been arrested for the kinds of crimes

that any of us, or at least our friends and neighbors, might be arrested for: those who violate traffic laws, leash laws, or insurance requirements, or maybe the Martha Stewarts and Bernie Ebbers of the world. Plaintiff Michael Marron was arrested for "credit card fraud at the Hotel Nikka [sic]," where any of us might stay when visiting San Francisco. Mary Bull's story might seem less compelling if she had been arrested for vandalism ordinaire, e.g. throwing bricks at a store window, rather than vandalism chic, throwing fake blood at a political protest. Steve Noh was arrested for battery "while celebrating Gay-Pride Week in the Castro," and Jonah Zern was arrested for resisting a police officer at a "peace" rally. We can imagine one of our close relatives, perhaps a child or grandchild, being put in jail under such circumstances. It's much harder to empathize when a strip search is suffered by those less like us, such as those who are suspected of engaging in robberies or street fights.

But in a democracy there is a very important value, enshrined in the Equal Protection Clause, in treating everyone who stands on the same footing alike. *See Vernonia Sch. Dist. 47J*, 515 U.S. at 663-64. If the government treats you badly, there's comfort in knowing that no one in the same situation is spared because of status, income or class. Not only does misery love company, but equal treatment for everyone—the rich and poor, the powerful and weak, blue collar as well as white—creates a strong political check against making the treatment worse. I'm convinced that airport searches would be far more intrusive if upper and middle-class Americans were exempt. Not only would the unexempt suffer the indignity of unequal treatment, but those conducting the searches would find good reason, and little political opposition, to ratchet up the duration and scope. The best protection for plaintiff de Ranleau, who is homeless, is to make sure that Marron, Bull, Noh and Zern are treated no better.

Second, lines drawn by courts rather than dictated by the functional requirements of an activity tend to be ambiguous,

subject to manipulation and difficult to administer. Treating everyone who gets on a commercial plane the same is simple: If you want to get on a plane, you take off your shoes, leave behind any liquids over three ounces, remove your laptop from its carrying case and pass through the metal detector—no exceptions. If we were to order an exemption for the least risky segments of the population, we'd have to worry about how to identify those people—that is, what kind of screening we'd have to set up to make sure no fakers get into the system—and then, at the point of entry, we'd have to confirm that the people presenting themselves for boarding were, in fact, the ones cleared in advance. The operation, and recent failure, of the Clear system (which let you cut to the front of the line but otherwise didn't exempt you from much of anything) showed that kind of exemption is difficult and costly to administer, and results in a lot of dirty looks from those you cut in front of.

Our case makes the point: The district court carved out a class of people to exempt from the strip-search policy consisting of all those arrested on a charge not involving (a) weapons, (b) controlled substances, or (c) violence, and (d) as to whom there was not individualized reasonable suspicion. Sounds easy to separate the sheep from the goats, but it's not. Keep in mind that a member of the class must satisfy (negatively) all four of the criteria—in other words, failure as to any one will take someone out of the class and make him subject to the strip-search policy. Each criterion is porous and subjective; there can be endless quarrels (and lawsuits) as to whether someone did or did not fall into any of the categories.

Let's start with the first one, weapons. If you're arrested for carrying a Gatling gun or Carl Gustav you would surely fall into the category, but what about a butterfly knife? How about a baseball bat or golf club? Or how about Lisa Giampaoli, one of the named plaintiffs, who was arrested because her dog bit a young man who was allegedly harassing her. Was that a leash law violation or an attack with a deadly canine? *See*

*People* v. *Nealis*, 283 Cal.Rptr. 376 (Cal. Ct. App. 1991). What about reckless driving: Traffic violation or attack with a ton of steel? Earlier this year, an en banc panel split 6-5 as to whether a shank made from melted-down Styrofoam and used by an inmate to wound another was a dangerous weapon. *United States* v. *Smith*, 561 F.3d 934 (9th Cir. 2009) (en banc). If federal judges can't agree, how are the deputies going to sort out such cases?

Next, controlled substances. Anyone caught with Smack or Crack falls into the category, but what about Valium or Oxy-Contin? What about unauthorized possession of steroids? Non-prescription drugs that contain pseudoephedrine? *See, e.g.*, *United States* v. *Jae Gab Kim*, 449 F.3d 933 (9th Cir. 2006). Alcohol and tobacco are highly controlled substances. Do plaintiffs Mangosing, Johnson and Bronson, arrested for public intoxication, fall into this category? Could the jail treat a merchant who sold cigarettes to a minor as someone charged with a controlled substance offense?

Now let's take the third category of offenses for which strip searches are permitted under the district court's order, namely people arrested for crimes of violence. We have a whole body of caselaw dealing with what constitutes a crime of violence for purposes of federal criminal and immigration law; among the activities we've considered are burglary, statutory rape, involuntary manslaughter, possession of an unregistered short-barreled shotgun, reckless vehicular assault, vehicular manslaughter while intoxicated, kidnapping, stalking, arson, escape, conspiracy to interfere with interstate commerce by robbery, grand theft, mayhem, recklessly setting fire to forest land, indecent liberties with a minor, carrying a gun while committing a drug offense and being an accessory after the fact to commission of murder for hire. And we often disagree. *See, e.g.*, *United States* v. *Chambers*, 473 F.3d 724, 726 (7th Cir. 2007) (escape is a crime of violence); *United States* v. *Piccolo*, 441 F.3d 1084, 1088 (9th Cir. 2006) (no it's not); *United States* v. *Asberry*, 394 F.3d 712, 715-16 (9th Cir.

2005) (statutory rape is a crime of violence); *id.* at 722 (Bea, J., concurring) (no way); *United States* v. *Wenner*, 351 F.3d 969, 974 (9th Cir. 2003) (burglary is not a crime of violence); *id.* at 977 (Wallace, J., dissenting) (is too); *United States* v. *Johnson*, 448 F.3d 1017, 1018 (8th Cir. 2006) (grand theft auto is); *Von Don Nguyen* v. *Holder*, 571 F.3d 524, 525 (6th Cir. 2009) (au contraire); *Malta-Espinoza* v. *Gonzales*, 478 F.3d 1080, 1084 (9th Cir. 2007) (stalking isn't); *id.* at 1088 (Duffy, J., dissenting) ("I respectfully dissent."); *United States* v. *Saavedra-Velazquez*, 578 F.3d 1103, 1110 (9th Cir. 2009) (Reinhardt, J.) (attempted robbery is); *id.* (Reinhardt, J., specially concurring) (or is it?); *United States* v. *Trinidad-Aquino*, 259 F.3d 1140, 1146 (drunk-driving-resulting-in-bodily-injury is a gentle crime); *id.* at 1147 (Kozinski, J., dissenting) (Bull!). How is a Deputy Sheriff confronted with a suspect arrested on possible charges of vandalism (like plaintiff Bull), burglary (like plaintiff Timbrook) or interfering with a police officer (like plaintiff Galvin) going to know whether such individuals are subject to search?

Finally, we get to the most troublesome category: cases where the deputies determine there's individualized suspicion for a search. The district court found this includes anyone with a prior involving weapons, controlled substances or violence, thereby importing all the ambiguities discussed above. But even arrestees without relevant priors may be searched if their conduct raises suspicion that they're smuggling contraband. So what exactly does that encompass? While struggling to prove that no member of the protected class has ever been found with contraband in their private spaces (a point the dissent takes up with some zest, Dissent at 2288, 2299, 2300-01, 2301-02, 2302, 2305), plaintiffs classify an arrestee who was "nodding off," and another who was "nervous," as inmates as to whom there was individualized suspicion. If "nodding off" and "nervous" are sufficient for individualized suspicion, can "gave me a dirty look," "was hyperactive" or "had poor posture" be far behind?

How, exactly, are deputies to know what does and does not amount to individualized suspicion, and who ultimately decides? Administering this category, like the others discussed above, will require a fair amount of trial and error, and a substantial degree of judicial involvement. No need to guess how much: A case pending before the same judge in the Northern District, *Yourke* v. *City and County of San Francisco*, No. 03-CV-03105-CRB, gives a foretaste. Yourke was arrested on a warrant for a traffic offense after police observed him engaged in what looked a lot like a drug deal. But Yourke claims it looked like an innocent chat between friends. Who's to say who's right? Not only will courts have to draw these difficult lines; jails will have to guess how courts will draw them. Being the subject of a court order and risking personal liability, deputies will probably err on the side of caution, to the detriment of prisoners faced with an increased risk of harm from smuggled contraband.

And when a search ends up in court, how will officers prove they had individualized suspicion? The record contains the report of a prisoner who told a guard, "wait to [sic] you see what I have up my ass." Was this a joke that the deputies were required to ignore or did it give them grounds for a strip search? And what if the inmate denies making the statement? Or disputes that he was "nodding off" or "nervous"? By its nature, individualized suspicion will rely on observations and diagnoses that will be hard (if not impossible) to record and relay to judges and juries months or years after the event.

Which brings me to my third objection to the judicial creation of sub-classes exempt from a search regime, namely that it will likely, perhaps inevitably, require far too much judicial involvement in the administration of the sub-class. It's easy enough to say who is and is not going to enter the general population of a jail, just as it's easy to say who is going to engage in a contact visit, board a commercial aircraft, enter a public building, drive a railroad or play high school football. The activity in question defines the class. But once courts

start carving out constitutionally favored sub-classes because the members belong to some imaginary group with a lower risk-rating than the class as a whole, courts cannot avoid getting intimately involved in the conduct of the activity. This one case has generated a substantial record, countless lower court pleadings and no less than seven appellate opinions—so far. And *Yourke*, a case involving just a single strip search, has been ongoing over six years. If plaintiffs here succeed, every strip search will become a potential federal case. Federal judges will start running the jails, along with pretty much everything else.

The intervention won't be limited to a single class action, either, as future litigants won't be bound by the lines drawn in earlier cases. If these plaintiffs were to prevail, nothing would prevent a future plaintiff from trying to show that wife-beaters aren't hardened criminals, generally act out of anger and frustration and not with premeditation and, though they might use a golf club or meat cleaver to threaten their mates, aren't likely to be packing such implements up their wazoos when police come to arrest them. Could that claim be dismissed out of hand? Not according to plaintiffs (including Marcy Corneau, arrested for "fighting with her boyfriend") and the dissent, who would put the onus on the jail to prove some past instance where a strip search of someone arrested for domestic violence yielded at least a dirk.

As this case illustrates, institutions aren't equipped to deal with such challenges, which generally call for justifications for past conduct that no one knew would be required. Thus, plaintiffs and the dissent try to get mileage out of the fact that defendants have been unable to point to a single member of the class found carrying contraband. Dissent at 2288, 2299, 2300-01, 2301-02, 2302, 2305. But at the time the searches were conducted, there *was* no class as defined by plaintiffs and the district court, so no one knew such justification would be required. The reports prepared by the jail to record the finding of contraband are accordingly ambiguous; very few

conclusively show that the individual found with contraband was *not* a member of the class, and about half are entirely silent as to why the individual was searched. Plaintiffs want us to infer that no contraband was ever found among the class, but that's hardly fair. The truth is that, on this record, we don't know. Moreover, as Judge Tallman's dissent from the panel opinion points out, plaintiffs' central claim that members of the class never, ever conceal contraband is almost certainly wrong as a matter of fact. *Bull* v. *City and County of San Francisco*, 539 F.3d 1193, 1210 (9th Cir. 2008) (Tallman, J., dissenting).

The reason past contraband reports don't disclose the crime for which the individual was arrested is that it's not germane to the purpose of the report, which is to account for a piece of property, possibly illegal or evidence of a crime, that has come into possession of the authorities. But if such reports are used in litigation, with omissions held against the institution, then a rational response will be to lengthen the reports to include any information that might be relevant to any case that any future plaintiff might bring. And it won't be just reports: There will be constant tweaking of policies to respond to the next class action, endless training as to what constitutes a "weapon" or a "controlled substance" and countless hours spent giving depositions and testifying in court. Pretty soon, those involved in operating the institution will be devoting most of their time and energy to averting liability rather than running the institution effectively.

The dissent shrugs this off as no big problem because, supposedly, the San Francisco jail system operates better than ever under a policy enacted in 2004 that, in effect, adopts the district court's order for the duration of the lawsuit. Dissent at 2299. But our dissenting colleague misreads the record. Both Sheriff Hennessey and Under-Sheriff Dempsey express grave doubts about the new policy; they make it quite clear that they are putting up with it in order to limit their liability, but that they believe it "increases the danger to staff and

inmates" and "will lead to a higher incidence of illegal contraband in the jails." The snippet of quotation excerpted in the dissent, to the effect that the new policy "strikes the right balance between safety and the rights of inmates," *id.*, comes from a portion of the Dempsey affidavit dealing with a different search policy that is not at issue in this appeal. The dissent is simply mistaken in suggesting that the interim intake policy works as well as the challenged policy.

I have a difficult time justifying this kind of judicial interference in what are quintessentially executive functions. In the absence of guidance from the Supreme Court—which is entirely absent—I don't believe we have the authority to carve out sub-classes of individuals under the Fourth Amendment who must be given preferred treatment by the government. Indeed, the Court's opinion in *Bell* v. *Wolfish* suggests otherwise. *See* 441 U.S. at 558-60. Some prisoners pose a much lower risk of accepting contraband on contact visits, and some visitors are far less likely to bring contraband than others. But nothing in *Bell* suggests that Ivan Boesky, Michael Milken or Martha Stewart must be treated better than other prisoners after a contact visit with their white-shoe lawyers. The possibility of these kinds of distinctions is markedly absent from the Court's discussion.

Thus, while I join Judge Ikuta's excellent opinion in full, I concur on the separate ground that I do not believe we, as inferior federal judges, have the authority to grant plaintiffs the relief they seek.

---

GRABER, Circuit Judge, specially concurring:

I concur specially in the result because, although I agree with Parts I and II of the dissent, I part company with its conclusion in Part III that the unconstitutionality of San Francis-

co's strip-search policy was clearly established at the time of the events in question.

The most relevant Supreme Court case, *Bell v. Wolfish*, 441 U.S. 520 (1979), *approved* an across-the-board policy to strip-search inmates following every contact visit with an outsider. By definition, a newly arrested person, similarly, has just been an outsider.

Moreover, as the dissent acknowledges, *some* categories of pretrial detainees (such as those with a criminal record and those arrested for violent offenses and drug offenses) do pose a significant risk of bringing contraband into the jail. Those categories of people may, constitutionally, be strip-searched before entering the general jail population. That procedure, in fact, protects people like the named plaintiffs who unwillingly find themselves in the same facility as more dangerous detainees.

Finally, none of our prior cases was sufficiently similar to this one to signal unequivocally that the San Francisco policy was improper.

Although I agree fully with the dissent's constitutional analysis and with the distinctions that the dissent draws between *Bell* and this situation, I cannot say that the unconstitutionality of this policy was clearly established before January 2004.

Accordingly, I concur in the result, but not the reasoning, of the majority opinion.

**Volume 2 of 2**

THOMAS, Circuit Judge, with whom Judges WARDLAW, BERZON, and RAWLINSON, join, dissenting:

Mary Bull was arrested at a political protest for pouring red dye mixed with corn syrup on the ground. At the police station, according to her testimony, she was pushed to the floor and her clothes forcibly removed. Her face was smashed against the concrete cell floor while jailors performed a body cavity search. She was left naked in the cell for eleven hours, then subjected to a second body cavity search. After another twelve hours in the jail, she was released on her own recognizance. She was never charged with a crime.

Charli Johnson was arrested for operating a motor vehicle with a suspended license. She alleges she was forcibly strip searched by male officers in a hallway, and that she was kept in a cold room, naked for twelve hours with male officers regularly viewing her. No contraband was found. She was released the next day. No charges were ever filed.

Sister Bernie Galvin, a Catholic nun and a member of the Sisters of Divine Providence, was arrested at an anti-war demonstration for trespassing. She was strip searched at the jail. No contraband was found.

Michael Marron was arrested for alleged credit card fraud at the Hotel Nikko, strip searched, and allegedly beaten and left naked in a cell for over ten hours. No contraband was found. All charges were eventually dismissed.

Laura Timbrook, who was arrested for bouncing small checks, was body cavity searched twice. No contraband was found. Deborah Flick alleges she was arrested for public intoxication, forcibly strip searched and left naked and bleeding in a cell overnight. Salome Mangosing, arrested for public drunkenness, was strip searched and forced to remain naked for twelve hours. Again, no contraband was found. Leigh Fleming was arrested for disturbing the peace. She was body

cavity searched and confined naked in a cold room for five hours. No contraband was found, and she was never charged with a crime.[1]

No officer testified that anyone suspected any of these individuals were hiding contraband in body orifices and, to no one's surprise, no contraband was found. Rather, they were forcibly stripped and searched under a policy that mandated routine body cavity searches of everyone arrested in San Francisco classified for the general jail population, regardless of how petty the offense.

In holding that such searches were unconstitutional, the district court faithfully applied a quarter century of Ninth Circuit law, which was consistent with the law of all but one of our sister circuits. Under that nearly uniform interpretation of constitutional law, a body cavity strip search of a detainee is only justified by individualized reasonable suspicion that the search will bear fruit. If jailors have no reasonable suspicion, the search must be categorically reasonable based on empirical evidence that the policy is necessary. Jailors are entitled

---

[1]These allegations, of course, remain to be proven at trial. That being said, many of the accounts of the searches are undisputed in the record, and there is no dispute about whether charges were filed or contraband discovered. The majority, while relying entirely on non-class data as the basis of its argument, suggests that the plaintiffs are precluded from citing probative evidence from non-class members. However, in analyzing a grant of summary judgment on the basis of qualified immunity, we construe the entire factual record in the light most favorable to the non-moving party in order to determine whether there has been a constitutional violation. *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004). This analysis includes drawing all permissible inferences from the record in the light most favorable to the non-moving party. *Dias v. Elique*, 436 F.3d 1125, 1131 (9th Cir. 2006). The majority also suggests that these particular facts cannot be examined because the plaintiffs have asserted facial invalidity of the regulations. To be sure, a portion of the complaint, which is not at issue in the appeal, sought injunctive relief. However, the claims at issue on this appeal are § 1983 damage claims challenging the constitutionality of the actual, not theoretical, searches.

to strip search those whose arrest charges, criminal history, probation status, or suspicious behavior create a reasonable justification for believing the person arrested might be concealing contraband in a body cavity. That interpretation was consistent with the leading Supreme Court case on the topic, *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), which required "balancing of the need for the particular search against the invasion of personal rights that the search entails."

The majority sweeps away twenty-five years of jurisprudence, giving jailors the unfettered right to conduct mandatory, routine, suspicionless body cavity searches on any citizen who may be arrested for minor offenses, such as violating a leash law or a traffic code, and who pose no credible risk for smuggling contraband into the jail. Under its reconfigured regime, the majority discards *Bell*'s requirement to balance the need for a search against individual privacy and instead blesses a uniform policy of performing body cavity searches on everyone arrested and designated for the general jail population, regardless of the triviality of the charge or the likelihood that the arrestee is hiding contraband.

The rationale for this abrupt precedential departure is founded on quicksand. Indeed, the government's entire argument is based on the logical fallacy *cum hoc ergo propter hoc* — happenstance implies causation. The government argues that contraband has been found in the San Francisco jails. Thus, the government reasons, individuals who are arrested must be smuggling contraband into the jail. Therefore, the government concludes it must body cavity search everyone who is arrested, even those who pose no risk of concealing contraband, much less of trying to smuggle contraband into the jail.

This reasoning finds no support from the record in this case. Although there is evidence of some arrestees attempting to conceal contraband during their arrest, there is not a single documented example of anyone doing so with the intent of

smuggling contraband into the jail. More importantly, for our purposes, there is not a single example of anyone from the class defined by the district court who was found to possess contraband upon being strip searched. Not one.

Indeed, and ironically, the record shows that most of the individual plaintiffs who were body cavity searched were never actually placed in the general jail population at all. Because they were never housed with other detainees, these individuals posed absolutely no risk of "smuggling" contraband into the general jail population. They were body cavity searched anyway, simply because they were *classified* for potential placement in the general jail population.

Most of the individual plaintiffs were either never charged with any crime, or had the charges dismissed. There is no evidence in the record of a successful prosecution against any of the individual plaintiffs.

The district court carefully defined the class of plaintiffs, excluding all those whose objective characteristics bestowed sufficient reasonable suspicion to justify a body cavity search. Not only is there not a single example of any class member searched who possessed contraband, there is no statistical evidence in the record that the amount of contraband found in the jails decreased during the period when all arrestees were body cavity searched. And what has happened to the amount of contraband found inside cells since the jailors adopted a more constitutionally sound approach? The government cannot show there has been any increase at all.

Even though it has no record evidence to support its theory, the government nevertheless presses us to abandon all constitutional protections and to bless mandatory routine body cavity searches of those who, as a group, pose no reasonable risk of secreting contraband. All but one circuit has rejected this approach, with good reason. Suspicionless, routine, mandatory strip search policies flatly contradict the balancing of

interests that the Supreme Court has instructed us to undertake. And, as the record in this case and others demonstrates, such policies result in abusive, unnecessary body cavity searches of those who pose no security risk. This record provides no evidentiary reason to justify the abandonment of our long-standing constitutional precedent, and every reason to uphold it. I respectfully dissent.

I

Until January 2004, San Francisco had a policy of strip searching all pre-arraignment arrestees entering County Jail No. 9 who fell into certain categories. Some arrestees were searched because of the crime they were charged with or their criminal histories; some were searched solely because they were classified for housing in the general jail population. The policy applied to all arrestees classified for housing in the general jail population, even those arrested for violating minor traffic laws — like failure to carry insurance or driving with a suspended license. The strip search procedure was invasive: it involved inspection of the naked body, including the arrestee's breasts, buttocks, and genitalia, as well as a visual inspection of the arrestee's body cavities. In 2003, Mary Bull and a class of similarly-situated plaintiffs brought suit against the City for violations of their Fourth and Fourteenth Amendment rights.

Judge Breyer, presiding over the district court, tailored the class of plaintiffs extremely narrowly. In an order issued June 10, 2004, the district court defined the class as:

> All persons who, during the applicable period of limitations, and continuing to date, were arrested on *any* charge *not* involving weapons, controlled substances, or a felony charge of violence, and *not* involving a violation of parole or a violation of probation (where consent to search is a condition of such probation), *and* who were subjected to a blan-

ket visual body cavity strip search by defendants before arraignment at a San Francisco County Jail facility without any individualized reasonable suspicion that they were concealing contraband. This class also includes 1) all arrestees who were subjected to subsequent blanket strip search(es) before arraignment after the initial strip search, without any reasonable individualized suspicion that they had subsequently acquired and hidden contraband on their persons; and 2) all persons who, prior to arraignment, were subjected to blanket visual body cavity search(es) incident to placement in a "safety cell" at any of the San Francisco County Jails.

*Bull v. City and County of San Francisco*, No. 03-01840 (N.D. Cal. June 10, 2004) (order denying preliminary injunction). The class was further limited by the district court's February 23, 2006 order, which held that San Francisco's policy of strip searching arrestees on the basis of their criminal history was lawful. *Bull v. City and County of San Francisco*, No. 03-01840 (N.D. Cal. Feb. 23, 2006) (amended order re motions for summary judgment). The class before this Court are thus arrestees who were strip searched prior to arraignment solely because they were classified for housing in the general jail population and posed no other objective risk that they would smuggle contraband.

## II

Supreme Court precedent and common sense compel the conclusion that San Francisco's mandatory, routine, suspicionless body cavity search policy violated the Constitution.

## A

We begin with first principles. The Fourth Amendment requires that we evaluate "a search or seizure in light of traditional standards of reasonableness 'by assessing, on the one

hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " *Virginia v. Moore*, 553 U.S. ___, 128 S. Ct. 1598, 1604 (2008) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

Fourth Amendment inquiries are driven by the specific context in which searches arise. Our "reasonableness" analysis is bound by the facts of the individual case before us. *Scott v. Harris*, 550 U.S. 372, 383 (2007) (describing the inquiry as a "factbound morass"). The Supreme Court has long recognized that although the constitutional rights of prisoners and arrestees are relaxed, "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974); *see also Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.").

Specific security concerns affect the constitutionality of a search. *Friedman v. Boucher*, 580 F.3d 847, 857 (9th Cir. 2009) ("We have . . . carefully confined administrative searches at detention facilities to those reasonably related to security concerns."). Searches performed on arrestees that do not contribute to prison security are unconstitutional. *Id.* at 853-57 (holding unconstitutional a search to obtain a buccal swab from a detainee for the purpose of gathering information for a DNA bank designed to solve cold cases).

Not all searches are created equal. The Fourth Amendment differentiates between more and less intrusive searches, and requires varying levels of need to justify different kinds of searches. "[T]he scope of the particular intrusion, in light of all the exigencies of the case, [is] a central element in the analysis of reasonableness." *Terry v. Ohio*, 392 U.S. 1, 18 n.15 (1968). Because the Fourth Amendment "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails," *Bell*, 441 U.S.

at 559, the most invasive search is justified only by the most compelling need. *See Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983) ("The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted." (citing *Terry*, 392 U.S. at 18 n.15)).

The strip searches in this case are the most serious of personal invasions. "The intrusiveness of a body-cavity search cannot be overstated. Strip searches involving the visual exploration of body cavities [are] dehumanizing and humiliating." *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 711 (9th Cir. 1990), *abrogated on other grounds by Hunter v. Bryant*, 502 U.S. 224 (1991) (per curiam); *see also Bell*, 441 U.S. at 576-77 (Marshall, J., dissenting) ("In my view, the body-cavity searches . . . represent one of the most grievous offenses against personal dignity and common decency."). Only a truly compelling need justifies such an invasive search.

In *Bell*, the Supreme Court case that governs our inquiry, the Court considered the constitutionality of prison strip searches after contact visits. The policy in that case required all inmates in New York's Bureau of Prisons facilities "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." *Bell*, 441 U.S. at 558; *see also id.* at 558 n.39 (describing the search procedure).

Although the policy gave the Court "pause," *id.* at 558, the Court ultimately upheld the policy's constitutionality. The Court considered "whether visual body-cavity inspections as contemplated by the [detention facility] rules can *ever* be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can." *Id.* at 560. The Court thus set the justification for strip

searches at something less than probable cause, but declined to explicitly specify the level of suspicion.

In its analysis, the Court reiterated the case-by-case nature of Fourth Amendment inquiries:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell*, 441 U.S. at 559. The case-by-case, search-by-search method described by this passage suggests that a mandatory, routine, strip search policy, absent any individualized or categorical suspicion, would be unconstitutional.

In *Giles v. Ackerman*, 746 F.2d 614 (9th Cir. 1984) (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (en banc), we interpreted *Bell* to require a prison administrator to have reasonable suspicion before strip searching an arrestee charged with a minor offense. *Id.* at 617 ("[A]rrestees charged with minor offenses may be subjected to a strip search only if jail officials possess a reasonable suspicion that the individual arrestee is carrying or concealing contraband."). In so holding, we relied not only on the language in *Bell* but also on the existing interpretations of other circuits. *See, e.g.*, *Mary Beth G.*, 723 F.2d at 1273 ("[E]nsuring the security needs of the City by strip searching plaintiffs-appellees was unreasonable without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed."); *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981) ("An indiscriminate strip search policy routinely

applied to detainees . . . cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations.").

We've revisited *Giles* on a number of occasions, each time reaffirming the individualized reasonable suspicion standard. In *Ward v. County of San Diego*, 791 F.2d 1329, 1331-33 (9th Cir. 1986), *cert. denied*, 483 U.S. 1020 (1987), we held that absent reasonable suspicion of possession of a weapon or contraband, a mandatory, routine, body cavity strip search policy of a misdemeanor arrestee prior to a determination regarding the arrestee's eligibility for an own recognizance release was unconstitutional.

In *Thompson v. City of Los Angeles*, 885 F.2d 1439 (9th Cir. 1989), we held that the strip search of a person arrested for felony grand theft auto was valid because the charge was "sufficiently associated with violence to justify a visual strip search," but also noted that intermingling with the general jail population by itself did not justify the search. *Id.* at 1447.

The next year, we held unconstitutional the City of Los Angeles's mandatory, routine, strip search policy that subjected all felony arrestees to a visual body cavity search. *Kennedy*, 901 F.2d at 713-14 (holding that the mere fact of a felony charge bears no reasonable relationship to institutional security concerns).

We reaffirmed our holding in Giles as recently as 2006. *Way v. County of Ventura*, 445 F.3d 1157, 1161 (9th Cir. 2006), *cert. denied*, 549 U.S. 1052 (2006) (recognizing "the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference we owe jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security," but concluding that "a blanket policy is [not]

constitutionally acceptable simply by virtue of jail officials' invocation of security concerns").[2]

The overwhelming majority of circuits believe that Bell mandates a reasonable suspicion standard. However, even if we assume that it does not, *Bell* at the very least mandates a factbound, data-driven inquiry into the categorical reasonableness of the search.[3] Categorical reasonableness must rely on situational suspicion. It is informed by the probability that the search will bear fruit. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) (noting that only "a fair probability that contraband or evidence of a crime will be found in a particular place" justifies the need for a search).

---

[2]The Supreme Court, in a slightly different context, recently reaffirmed the idea that a strip search policy violates the Fourth Amendment when there is little evidence that the searches will result in the discovery of contraband. In *Safford Unified Sch. Dist. #1 v. Redding*, 129 S. Ct. 2633 (2009), the Court held that a strip search of a schoolgirl was unconstitutional in part because the school could not show any evidence that the search would bear fruit. *See id.* at 2642 (holding that "the content of the suspicion" must match "the degree of intrusion" and that "the categorically extreme intrusiveness of a search" requires "some justification in suspected facts" beyond "general background possibilities"); *id.* at 2642-43 ("[W]hat was missing from the suspected facts . . . was any indication of danger to the students . . . and any reason to suppose that [the searchee] was carrying pills in her underwear. We think that the combination of these deficiencies was fatal to finding the search reasonable.").

[3]The categorical approach of strip searching everyone that the majority proposes is novel in practice. No other circuit has employed such an approach. The only circuit to mention a similar categorical approach is the Fifth, which explicitly rejected it as a broad brush technique for avoiding the reasonable suspicion requirement. *See Stewart v. Lubbock County*, 767 F.2d 153, 156-57 (5th Cir. 1985) ("Because Lubbock County's strip search policy was applied to minor offenders awaiting bond when no reasonable suspicion existed that they *as a category of offenders* or individually might possess weapons or contraband, under the balancing test of *Wolfish* we find such searches unreasonable and the policy to be in violation of the Fourth Amendment." (emphasis added)). For any categorical approach to strip search policy to adhere to the Constitution, it must be narrowly tailored and grounded in empirical evidence that the policy is necessary as applied to the category of detainees in question.

The district court clearly understood and applied this long standing precedent. As Judge Breyer put it:

> The indignity of the strip search is great. And is not a minor or incidental humiliation. It's a serious intrusion [on] a person's personal right to privacy, in my view. And I don't think there's a large amount of argument over that point.

> Therefore, there has to be a countervailing safety concern that would warrant that type of intrusion. That is what this is about. It is not any more complicated than that, I think.

The district court understood that, under *Bell* and our precedent, strip searches must be justified by individualized reasonable suspicion or categorical reasonableness based on empirical evidence that the policy is necessary. On a careful application of precedent as to those arrested for minor offenses, the district court concluded that San Francisco's policy could not be justified by either reasonable suspicion or categorical reasonableness. The district court was entirely correct.

B

The majority suggests that *Turner* might apply as well to supplant the traditional *Bell* analysis. *Turner* considered the constitutionality of restrictions on inmate marriage and correspondence. In so doing, *Turner* set a new standard—one more deferential to prison administrators than the standard set by *Bell*—by which to judge prison regulations that impinge on inmates' constitutional rights. *See Turner*, 482 U.S. at 89-91. *Turner* never overturned *Bell*, however, and *Bell* directly controls here. Thus, it is *Bell*'s standard that we must apply, not *Turner*'s. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons

rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Powell v. Barrett*, 541 F.3d 1298, 1302 (11th Cir. 2008) (en banc) (declining to apply the *Turner* standard and stating that "[u]ntil the Supreme Court tells us that the *Bell* approach no longer applies where that Court applied it, we are inclined to continue using it"); *Watt v. City of Richardson Police Dep't*, 849 F.2d 195, 196 (5th Cir. 1988) ("Analysis of the city's strip search policy and of the actual search conducted on Watt begins, and practically ends, with the Supreme Court's decision in *Bell*.").

Further, the underpinnings of *Turner* are significantly different from those considered in *Bell*. *Turner* involved incarceration of convicted criminals. Thus, the test developed in *Turner* involved the application of "legitimate penological interests." 482 U.S. at 89. "Penological interests are interests that relate to the treatment (including punishment, deterrence, rehabilitation, etc.) of persons convicted of crimes." *Benjamin v. Fraser,* 264 F.3d 175, 187 n.10 (2d Cir. 2001). " 'Penological' means relating to the theory and practice of prison management and criminal rehabilitation." *Mauro v. Arpaio*, 188 F.3d 1054, 1068 (9th Cir. 1999) (en banc) (Kleinfeld, J., dissenting). "The word is derived from the Greek and Latin words meaning penalty or punishment, and still means roughly the same thing." *Id.* Penological considerations—punishment, deterrence, rehabilitation—have no relevance to detainees who have not been convicted of any crime. These detainees still enjoy the presumption of innocence. To be sure, management of jails (which may house both pretrial detainees and convicts) and prisons (which house convicts) share many common management considerations, but the analysis of the rights of pre-trial detainees and convicts must differ because penological interests do not apply to pre-trial detainees. Thus, the "balancing of the need for the particular search against the invasion of personal rights that the search entails," *Bell*, 441 U.S. at 559, in the pre-trial detainee context

is quite different from the analysis of whether a particular prison regulation that impinges on inmates' constitutional rights is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The distinctions between the *Bell* and *Turner* analyses are particularly important in this context, which involves some detainees who were never even charged with a crime. The Supreme Court has never conflated the analyses of *Bell* and *Turner*. Neither have we in a case involving a pre-trial detainee.[4] *Bell* governs our inquiry here.

C

Because the Fourth Amendment reasonableness inquiry is factbound, we must consider whether the specific facts of this case justify San Francisco's blanket strip search policy. Viewing the facts in the light most favorable to the plaintiffs—as we must on summary judgment for qualified immunity, *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004) —the facts fail to justify the policy.

San Francisco could have satisfied the standard set out in *Bell* had it been able to either produce reasonable suspicion for its searches or justify its policy categorically by presenting specific evidence of smuggling among the class of plaintiffs in this case. The challenged portion of San Francisco's policy did not consider such individualized factors and instead required strip searches of arrestees based solely on their classification for housing in the general population. Thus, San

---

[4]The majority cites Ninth Circuit cases for the proposition that the *Turner* standard already has been incorporated into *Bell* cases: *Thompson v. Souza*, 111 F.3d 694, 699-700 (9th Cir. 1997); and *Michenfelder v. Sumner*, 860 F.2d 328, 332-33 (9th Cir. 1988). Both are distinguishable. Both *Thompson* and *Michenfelder* involve claims brought by prisoners already serving sentences, and Michenfelder was in a maximum security unit. Consequently, these cases actually involve legitimate penological interests, and therefore *Turner*. They do not provide any support for applying *Turner*'s rationale to cases involving pre-trial detainees in the circumstance described in *Bell* and the instant case.

Francisco was required to demonstrate at least categorical reasonableness.

The City's burden was not great: the district court had already done much of the City's work by excluding most arrestees from the class. In essence, the district court found, as a matter of law, that the City satisfied *Bell*'s reasonableness requirement for all detainees arrested on weapons, violence, or controlled substance charges or for violation of parole or probation, or who have a criminal history. The small set of plaintiffs that the district court allowed to proceed were only those whose backgrounds did not give rise to the categorical suspicion necessary to justify a strip search. It was thus the City's burden to prove that the narrow class of plaintiffs warranted strip searching.

San Francisco could not meet its burden. Of all the incidents of discovered contraband documented by Defendants and presented to the district court, *not one* documents a single uncontroverted instance of a class member possessing contraband when arrested and searched. In some instances where contraband was found, charging documents are missing and we are unable to determine whether the arrestee would have qualified as a member of the class. In other instances, the criminal history of the arrestee is missing, again making it impossible to determine whether the arrestee could be a class member. As an appellate court, "[i]n general, we consider only the record that was before the district court." *United States v. W. R. Grace*, 504 F.3d 745, 766 (9th Cir. 2007). Absent more information, the record provides no evidence that anyone who would qualify for membership in the certified class possessed concealed contraband. That result is unsurprising. People with no criminal history who violate dog leash or mandatory insurance laws, as a class, pose fewer security risks than those arrested for acts of violence or drug offenses.

Given this lack of evidence, one might wonder why the City is pressing its argument so strongly. After all, it has

changed its policy to conform to the Constitution. It now requires individualized suspicion based on objective factors before body cavity searching an arrestee. According to the affidavits filed by the government, the new policy works well and "strikes the right balance between safety and the rights of inmates." Nothing in the record suggests a sudden surge of contraband accompanying the policy change.

The real answer lies in the government's affidavits. In the testimony submitted by the government, officials complain that it is administratively inconvenient to comply with the Constitution: that it requires additional training for its officers and that it could save time if it did not have to conduct individualized assessments. Indeed, the large record in this case shows beyond a doubt that administrative inconvenience is San Francisco's sole justification for strip searching class members. But mere bureaucratic discomfort does not justify constitutional violations, and the Supreme Court has repeatedly told us so. *See Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) ("[A]lthough efficacious administration of governmental programs is not without some importance, 'the Constitution recognizes higher values than speed and efficiency.'" (quoting *Stanley v. Illinois*, 405 U.S. 645, 656 (1972))); *United States v. U.S. Dist. Court*, 407 U.S. 297, 321 (1972) ("Although some added burden will be imposed upon the Attorney General, this inconvenience is justified in a free society to protect constitutional values."). Further, the record shows that the administrative inconveniences of the new policy—requiring an official to have individualized suspicion before inspecting an arrestee's body cavities—did not pose a particularly heavy burden.

Because there is absolutely no evidence that contraband was smuggled into the prison by eligible class members, San Francisco had no reason—categorical or otherwise—to suspect that arrestees falling into the class of plaintiffs certified in this case were smuggling contraband. Thus, San Francis-

co's strip search policy was unreasonable and violates the Fourth Amendment.

This conclusion is consistent with the Court's decision in *Bell*. In *Bell*, the strip search policy was constitutional because the Supreme Court had before it both a record of smuggling and a categorically reasonable justification for the policy. First, the Court had before it a record showing that inmates often attempted to smuggle contraband into prisons after contact visits. Although "petitioners proved only one instance in the [prison facility's] short history where contraband was found during a body-cavity search," *Bell*, 441 U.S. at 558, "inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record and in other cases," *id.* at 559 (internal record citation omitted). Here, not even that showing could be made. There is simply no evidence that detainees falling into the extremely narrow class of plaintiffs certified by Judge Breyer attempted to smuggle contraband. Nor, for that matter, is there any evidence at all of any attempts by anyone to *smuggle* contraband via arrest. Certainly, concealed contraband was discovered during strip-searches of *non-class members*; however, nothing in the record indicates that these incidents involved anything more than an arrestee attempting to conceal possessed contraband upon arrest.

Second, contact visits are planned. As a matter of common sense, contact visits are far more likely to lead to smuggling than initial arrests. Indeed, contrary to the evidence in this case, the record in other cases has shown that "despite thorough searches, contact visits result in the smuggling of contraband, particularly drugs." *Toussaint v. McCarthy*, 801 F.2d 1080, 1114 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995). The record in this case supports the conclusion that contraband finds its way into the City's jails through means other than smuggling during arrest. The City has documented the presence of contraband in its cells. However, of approximately

150,000 searches over a three-year period in the intake facility, the City could only produce evidence to the district court of 78 incidents where contraband was discovered during an intake strip search. None of those, of course, involved class members.

Absent individualized reasonable suspicion or any evidence at all that the class of plaintiffs here presented a risk of smuggling, the City is left to speculate that detainees are attempting to smuggle contraband into detention centers by concealing contraband during arrest. Indeed, the City has suggested that some detainees get arrested just to smuggle contraband into prisons. There is not even anecdotal support for this notion, which is impermissibly founded only "on the gossamer threads of whimsey, speculation and conjecture." *Hahn v. Sargent*, 523 F.2d 461, 467 (1st Cir. 1975) (quoting *Manganaro v. Delaval Separator Co.*, 309 F.2d 389, 393 (1st Cir. 1962)). There is just no evidence at all in the record that class members pose any risk to the security of San Francisco jails.

We are asked to ignore this stark record on the theory that we ought always defer to jailors on matters of security, whether or not the government can make a plausible showing that a security risk exists at all. Of course, deference to prison administrators is instrumental in maintaining prison security. *See Bell*, 441 U.S. at 547. Such deference is ingrained into our system of judicial review. *See generally Pell v. Procunier*, 417 U.S. 817, 827 (1974). However, "blind deference to correctional officials does no real service to them." *Wolff*, 418 U.S. at 588 (Marshall, J., dissenting) (quoting *Palmigiano v. Baxter*, 487 F.2d 1280, 1283 (1st Cir. 1973)). The Supreme Court has instructed that deference has its limits. A policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. "[I]f the prison authorities do not conform to constitutional minima, the courts are under an obligation to take steps to remedy the violations." *Rhodes v.*

*Chapman*, 452 U.S. 337, 362 (1981) (Brennan, J., concurring). Our deference reaches its limits here.

D

The realities of the constitutional issues here at stake are far from trivial. The Seventh Circuit has described strip searches as "demeaning," "dehumanizing," and "repulsive." *Mary Beth G.*, 723 F.2d at 1272. The Tenth Circuit has called them "terrifying." *Chapman v. Nichols*, 989 F.2d 393, 396 (10th Cir. 1993). The Eighth Circuit has called them "humiliating." *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982).

Many reports document the unfortunate connection between strip searches and sexual abuse of prisoners. *See* Cheryl Bell et al., *Rape and Sexual Misconduct in the Prison System: Analyzing America's Most "Open" Secret*, 18 YALE L. & POL'Y REV. 195, 203 (1999) ("Female inmates have also reported that guards improperly touch them while performing body searches.").[5]

One need only look to the record before us to find troubling instances of abuse during the strip search process. The named plaintiff, Mary Bull, was arrested for vandalism during a political protest. She claims that after she declined to consent to a body cavity search, she was told that unless she consented, she would be forcibly strip searched. She alleges that an officer told her that if she did not consent, she would be "thrown into a cold room, naked, for 24 hours." She declined to consent, and describes what happened next:

I was then forcibly strip searched in an area visible

---

[5]*See also* Amnesty International, "Not part of my sentence": Violations of the Human Rights of Women in Custody, http://www.amnestyusa.org/document.php?id=D0F5C2222D1AABEA8025690000692FC4&lang=e (last visited October 1, 2009) (detailing instances of sexual abuse occurring during strip searches).

> to persons not participating, my clothes were pulled off, my legs were thrown into a squatting position while I was lying on the floor in front of male officers. My genital and rectal areas were inspected.

During the search, Bull's "face was smashed against the concrete" by the prison officials. She was then left naked in a cold room for twelve hours. In the morning, she was removed from the cell and again informed that she was required to consent to a strip search. She declined. She was forcibly strip searched again, and again left naked in a cold room for another twelve hours. She was then released on her own recognizance. She has never been charged with any offense.[6]

Salome Mangosing, arrested for public drunkenness,

---

[6]The majority characterizes the lead plaintiff Bull's complaint solely as a challenge to the jail's safety cell policy. The objection of the majority to a reference to a plaintiff who also challenges the safety cell policy is somewhat puzzling, given that the majority's entire argument rests on the contraband found during strip searches of out-of-class members. Nevertheless, Bull's actual allegations are much broader than a challenge to the safety cell policy. She was placed in a safety cell for a portion of her incarceration, and the district court denied her summary judgment because of genuine issues of material fact concerning the particular circumstances of her search. However, the reason Bull was placed in a safety cell was because she refused to consent to be strip searched. At that time, all arrestees were asked to sign a form consenting to a strip search. However, if the detained person declined to sign it, he or she was strip searched anyway. According to an officer involved in Bull's detention, refusal to sign a consent form constituted "bizarre" behavior fitting the criterion of placement in a safety cell because "it impeded the intake process." In her affidavit, Bull claims that an officer told her that if she did not submit to a body cavity search she "would be thrown into a cold room, naked, for 24 hours." Bull did not consent and was forcibly strip-searched in the safety cell. She testified that she was left in the cell, naked, overnight. In the morning, she was removed from her cell and informed that she had to consent to a second body cavity search. She objected, and was forcibly body-cavity searched a second time. She testified that she was again left naked in a cell, but later assigned to a room with eight bunk beds, where she stayed until her release.

alleges that she was kicked repeatedly during her search while she lay prostrate on the ground. According to Mangosing, one prison official placed her foot on Mangosing's neck while another twisted her arm behind her back. Mangosing was forced to remain naked for twelve hours.

Michael Marron, who was arrested for alleged credit card fraud at a local hotel, was strip searched, and allegedly beaten and left naked in a cell for over ten hours. Michele De Ranleau who was arrested for illegal lodging, allegedly was strip searched twice, and left in a cell naked for twelve hours. All charges were dropped.

Laura Timbrook was arrested for writing checks on an account with insufficient funds and body cavity searched twice. Deborah Flick alleges she was arrested for public intoxication, forcibly strip searched and left naked and bleeding in a cell overnight. The record contains other similar examples. Many of the persons who testified to this treatment were never charged with any crime and never actually housed in the general jail population.

That abuse often accompanies mandatory body cavity searches should not surprise us. Body cavity searches dehumanize those who are subject to them, and those performing routine searches in volume become desensitized to the invasion of body privacy. Enforcing the minimal constitutional right of individualized consideration of risk forces officers to view those arrested as individual humans, rather than as booking-numbered objects to be processed.[7]

A policy that so severely erodes human dignity and intrudes upon constitutional rights requires strong justification. We have, in the past, afforded proper deference when

---

[7]*See generally* PHILIP ZIMBARDO, THE LUCIFER EFFECT: UNDERSTANDING HOW GOOD PEOPLE TURN EVIL (2007) (describing the effect of the Stanford prison experiments on guard and inmate interaction).

presented with evidence of legitimate security concerns. How-
ever, San Francisco not only fails to offer any evidence that
arrestees belonging to the class of plaintiffs smuggled contra-
band into the jail, it does not even offer a plausible, hypotheti-
cal justification for its policy, aside from minor bureaucratic
inconvenience. Proper deference cannot be founded on a com-
plete absence of proof. Judicial review cannot be halted when
the government's rationale is simply "because I said so."
Under proper, deferential judicial review, San Francisco's for-
mer mandatory body cavity search policy cannot pass consti-
tutional muster.

E

Concluding that the policy at issue violates the arrestees'
Fourth Amendment rights falls squarely in line with the law
of the vast majority of our sister circuits. In justifying the strip
search policy, the majority overrules two bedrock Fourth
Amendment cases: *Giles v. Ackerman* and *Thompson v. City
of Los Angeles*. These cases are not just widely-cited by our
circuit, they are accepted throughout the circuits. The majority
exiles us from the legal mainstream.

The circuits are near-unanimous in rejecting the majority's
contention that *Bell* eliminated the reasonable suspicion
requirement for conducting a strip search. The Second Circuit,
for example, in holding a policy of strip searching all
arrestees unconstitutional, determined that *Bell* "did not . . .
read out of the Constitution the provision of general applica-
tion that a search be justified as reasonable under the circum-
stances. The imposition of a standard short of probable cause
in determining the balance of interests at stake in [*Bell*] in no
way dispensed with that requirement." *Weber v. Dell*, 804
F.2d 796, 800 (2d Cir. 1986), *cert. denied*, 483 U.S. 1020
(1987).

The First Circuit has also found that *Bell* did not eliminate
the reasonable suspicion requirement. *Swain v. Spinney*, 117

F.3d 1, 7 (1st Cir. 1997). The *Swain* court found unconstitutional a strip search of a woman arrested on suspicion of theft and possession of marijuana. The court held that "it is clear that at least the reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context" and that "courts have concluded that, to be reasonable under *Wolfish*, strip and visual body cavity searches must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons." *Id.*; *see also Wood v. Hancock County Sheriff's Dep't*, 354 F.3d 57, 62 (1st Cir. 2003) ("Our case law holds that an individual detained on a misdemeanor charge may be strip searched as part of the booking process only if officers have reasonable suspicion that he is either armed or carrying contraband."). Notably, the arrestee in *Swain* would not have been eligible for class membership in the case before us because she was arrested for possession of a controlled substance.

Other circuits have similarly found policies like the one before us unconstitutional. *See Masters v. Crouch*, 872 F.2d 1248, 1253-54 (6th Cir. 1989) ("*Bell v. Wolfish* does not validate a blanket policy of strip searching pretrial detainees. *Bell v. Wolfish* authorizes particularized searches where objective circumstances indicate such searches are needed to maintain institutional security."), *cert. denied*, 493 U.S. 977 (1989); *Jones v. Edwards*, 770 F.2d 739, 740, 742 (8th Cir. 1985) (holding unconstitutional the strip search of a detainee arrested for allowing his dog to run wild and stating that "security cannot justify the blanket deprivation of rights of the kind incurred here"); *Stewart v. Lubbock County*, 767 F.2d 153, 156 (5th Cir. 1985) (holding unconstitutional under *Bell*'s balancing test a strip search policy applied to minor offenders "when no reasonable suspicion existed that they as a category of offenders or individually might possess weapons or contraband"), *cert. denied*, 475 U.S. 1066 (1986); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984) (holding that intermingling with prison population absent any circumstances or prior offenses suggesting the possibility of conceal-

ing weapons or contraband was insufficient to warrant a strip search); *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981) ("An indiscriminate strip search policy routinely applied to detainees such as Logan along with all other detainees cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations."), *cert. denied*, 455 U.S. 942 (1982).

The majority cites with approval the recent Eleventh Circuit case *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (en banc). *Powell* is alone among the circuits. *Id.* at 1315-16 (Barkett, J., dissenting) ("For almost thirty years, circuit courts have followed the *Bell* Court's instructions and, until today, universally held that reasonable suspicion is necessary to constitutionally justify the types of searches before us."). *Powell* is also inapposite because the policy in that case mandated searches far less intrusive than the ones here. Under the policy in *Powell*, arrestees were required to undress and proceed to a large room with thirty to forty other arrestees to shower. After showering, the arrestees were "inspected" front and back by deputies. *Id.* at 1301. The policy did not mandate the far more degrading and invasive body cavity searches required by the San Francisco policy. As we have seen, the Fourth Amendment requires a "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559. The searches in *Powell* were far less intrusive than the searches here, requiring less justification for those searches. If *Powell* has any persuasive power, it is that the justification for the body cavity searches in the case before us must be much more compelling than the justification for the tamer searches in *Powell*.

The above-described opinions from the First, Second, Fourth, Fifth, Sixth, Eighth, and Tenth Circuits—and the fact that for twenty-eight years the Supreme Court has repeatedly declined to comment—clearly show that the majority's interpretation of *Bell* falls far outside the existing jurisprudence.

The conclusion is clear: the City's policy of routine, mandatory, suspicionless body cavity searches of those arrested for minor offenses who pose no credible risk of concealing contraband is unconstitutional.

## III

In a qualified immunity analysis, we must also consider whether the constitutional right violated by Defendants was clearly established at the time of the search. *See Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009)*; Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The key inquiry is whether a reasonable person could have believed his actions lawful at the time they were undertaken. *Anderson v. Creighton*, 483 U.S. 635, 646 (1987).

The City's challenged strip search policy was in place until January 2004. It was clearly established by that time that conducting strip searches of pre-arraignment arrestees based solely on the fact that they were assigned for transfer to the general jail population was unconstitutional. We have consistently required consideration of individual factors, such as arrest charges, criminal history, and suspicious behavior, to justify strip searches of pre-arraignment arrestees. As the district court in this case rightly observed: "It was . . . abundantly clear after *Thompson* that placement in the general jail population cannot [sic] 'by itself cannot justify a strip search.' " *Bull v. City & County of San Francisco*, No. 03-01840, 2006 WL 449148, at *16 (N.D. Cal. Feb. 23, 2006).

Moreover, we have explicitly held several times that it was clearly established that strip search policies similar to San Francisco's are unconstitutional. In *Ward*, we concluded that "the law was sufficiently clear in *early 1981* so as to expose a public official who unreasonably authorized blanket strip

searches of minor offense arrestees to civil liability under 42 U.S.C. § 1983." *Ward*, 791 F.2d at 1332 (emphasis added). Although San Francisco's policy included arrestees charged with more serious offenses than those at issue in *Ward*, San Francisco's policy also applied to minor offense arrestees, such as those at issue in *Ward*. *See also Act Up!/Portland v. Bagley*, 988 F.2d 868, 871-72 (9th Cir. 1993) (noting that by 1989, it was clearly established that it was unconstitutional to strip search a detainee arrested for a minor offense without reasonable suspicion that the individual arrestee was carrying or concealing contraband; reasonable suspicion was based on factors such as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record).

Defendants argue that the large amount of documentary evidence they have produced distinguishes this case from other strip search cases. Because no other case confronted such a well-documented problem, Defendants contend, the law was not clearly established. However, the specific facts of previous cases need not be materially or fundamentally similar to the situation in question; rather, the salient question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 742 (2002).

The fact that San Francisco documented a contraband smuggling problem does not muddy the clarity of the law. The evidence Defendants produced to the district court shows only that contraband was a significant problem in San Francisco jails generally; it does not demonstrate that persons eligible for inclusion in this class of plaintiffs contributed significantly, or even at all, to that problem. Therefore, San Francisco's policy is not different enough from policies that we have held unconstitutional to suggest that the rights violated by the policy were not clearly established.[8] Sheriff Hennessey is not entitled to qualified immunity.

---

[8]That the majority overturns two seminal strip search cases *Giles* and *Thompson*—is further evidence that, at the time of the strip search policy, the rights violated by the policy were clearly established.

IV

For decades, we have followed Supreme Court precedent and required that body cavity strip searches of arrestees be based on reasonable suspicion, created either by individual circumstances or reasonable objective factors. Today, we depart from that commonsense approach and sanctify routine, mandatory, indiscriminate, suspicionless body cavity searches for anyone arrested and classified to the general jail population, regardless of how petty the offense. The record in this case does not support this abrupt divergence from established law. Indeed, the only conclusion this record supports is that persons with no criminal history arrested for trivial offenses pose no credible risk of smuggling contraband into jails. The reinstallation of a more constitutionally sound policy has, according to government filings, worked well and has struck "the right balance between safety and the rights of inmates."

Our longstanding precedent also struck the right balance. It allowed strip searches of those whose arrest charges, criminal history, probation status, or suspicious behavior would create a reasonable justification for believing the person arrested might be concealing contraband in a body cavity. It precluded jailors from strip searching those who posed no credible risk of secreting contraband. Rather than bringing competing interests into equilibrium, today's decision removes the balancing scales altogether — to the detriment of constitutional rights and human dignity.

Nor should we take solace in the fact that every person is subject to a humiliating strip search, whether it be Sister Bernie Galvin, an honored long time community advocate for the poor who was arrested at an anti-war rally, or a pusher armed with weapons and caught in a crack house. Our constitutional oath requires us to do justice—not injustice—without respect to persons. Invading the rights of everyone, regardless of whether we have reason to suspect them or not, should give no one illusory comfort that we are providing justice for all.

I respectfully dissent.