RESTANI, Judge,
dissenting in part.
Because I believe the facts found by the district court, which the majority does not contend were clearly erroneous, render the warrantless search and seizure reasonable under the totality of the circumstances, I dissent from the majority’s decision to suppress the evidence seized during the jailhouse search.[1]
I.
The majority begins its discussion of the present case by choosing to describe the facts surrounding the jailhouse search in the most unfavorable light, at times engaging in wholesale speculation, to portray this case as one involving brutal, unnecessary police action. I believe it is helpful to clarify some of the more important factual considerations in order to fairly lay out the context the court must consider in evaluating the reasonableness of the police actions at issue.[2]
The majority opinion makes much of the fact that Gibbs “brought along his taser, gloves and ‘assistance’ in the form of additional officers because he thought Fowlkes might have drugs” and “retrieved a taser from his vehicle and put on latex gloves.” See Maj. Op. at 958-59, 965-66. Not only is this insinuation of an improper pre-search intent irrelevant under the objective test used to evaluate the reasonableness of the search, but Gibbs provided testimony, which the trial court appeared to credit, plausibly explaining all of his actions. Gibbs testified that he wore *973 gloves during all strip searches in the event he recovered evidence that was hidden on or in the arrestee’s body, because these items might be used as evidence (in which case fingerprints and/or DNA evidence might need to be protected) and because the items could have bodily fluids on them (posing a health hazard). He also explained that he brought his taser from his patrol vehicle, after obtaining permission to bring it into the jail, because Fowlkes had been verbally aggressive, and Fowlkes was a large individual (over six feet tall and 250 pounds).[3]
The majority also downplays an important fact in describing the search in this case. See id. at 961-62. The officers here were not completely in the dark as to what they were seeking to seize, probing inside Fowlkes as part of a wild goose chase. Instead, testimony from Officer Harris made clear that the officers knew that the object protruding from Fowlkes’ body cavity was unmistakably contraband for two reasons: a) it was an undisclosed plastic baggie, and b) it was almost certainly drugs.[4] Officer Harris described the bag as “a white object slightly protruding ... maybe a little bit less than a golf ball size, off-white substance in a plastic baggy. Or inside plastic.”
Finally, the majority asserts that “the record is devoid of any evidence from which the officers might reasonably have inferred that evidence would be destroyed if they took the time to secure a warrant and summon medical personnel.” Id. at 966. Contrary to this assertion, Gibbs testified during the evidentiary hearing on the motion to suppress that he was concerned the evidence could be destroyed or adulterated by Fowlkes. In fact, Gibbs explained that during past searches, he had witnessed defendants, who had secreted drugs into their body cavities, attempt to crush and swallow them during the strip search. Moreover, Gibbs explained that it was not uncommon for arrestees to become physically violent in order to prevent recovery of the contraband once it fell out. Thus, contrary to the majority’s conclusion, Gibbs’ testimony indicates that it was objectively reasonable to believe that Fowlkes might destroy the evidence. See Maj. Op. at 966 n. 8.
II.
Having set out the facts, tethered to the record before us, I turn now to the majority[5] holding that the search’ was unreasonable.
*974 “The expectations of privacy of an individual taken into police custody necessarily are of a diminished scope. Both the person and the property in his immediate possession may be searched at the station house. A search of the detainee’s person when he is booked into custody may involve a relatively extensive exploration....” Maryland v. King, — U.S. -, 133 S.Ct. 1958, 1978, 186 L.Ed.2d 1 (2013) (internal quotation marks, brackets, and citations omitted). “Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, ... his or her expectations of privacy and freedom from police scrutiny are reduced.” Id.
Under the Fourth Amendment, “[e]ven if a warrant is not required, a search ... must be reasonable in its scope and manner of execution.” Id. at 1970. The reasonableness analysis is fact-intensive and requires considerations of issues such as privacy, hygiene, and the training of those conducting the search. See Vaughan v. Ricketts, 859 F.2d 736, 741 (9th Cir.1988), abrogated on other grounds by Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); see also United States v. Carpenter, 496 F.2d 855, 855 (9th Cir.1974) (per curiam). To determine the reasonableness of a search, we balance the “scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.” Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).
Although the majority is correct that under Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), any bodily intrusion is a search within the meaning of that term, “[t]he fact that an intrusion is negligible is of central relevance to determining reasonableness.” King, 133 S.Ct. at 1969.[6] The removal of the protruding object here admittedly required an invasion of Fowlkes’ privacy interests beyond that of a visual search. The removal, however, did not require any further touching, intrusion, or probing into Fowlkes’ body.[7] This simply is not a case where the search required the government to probe inside the subject’s body cavity based on the belief that contraband might be concealed inside. Rather, it was a search that involved negligible additional *975 intrusion and was based on the presence of contraband in plain sight.
Additionally, unlike in Carpenter,[8] Fowlkes presented no medical testimony related to the danger of removing the protruding plastic bag, nor did Fowlkes argue that he was at risk for injury or was injured by the removal. Fowlkes’ assertion before the district court was that Gibbs forcefully inserted his fingers into Fowlkes’ anal cavity and probed, unsuccessfully, for drugs, facts that were rejected by the district court. As a result, Fowlkes made no allegations as to the harm caused by the actual removal of the protruding plastic bag, and there is nothing on the record from Fowlkes’ perspective indicating that the manner of removal was dangerous or harmful. Instead, the record states that the search was performed in a private area by LBPD officers wearing gloves and of the same sex as Fowlkes. The plastic bag was protruding far enough so that Gibbs could grab the bag with two fingers and pull it out, and there is no indication that this process was difficult or prolonged.
The only evidence on the record suggesting that the removal caused Fowlkes any pain or discomfort is a picture of the plastic bag after it was removed, which shows substances that appear to be blood and feces on the bag. Fowlkes argues the officers planted the plastic bag in the strip search room and denied that it was recovered from his body cavity. Thus, there is no testimony from Fowlkes as to the existence of the plastic bag inside of him or the manner of its removal, and there is nothing on the record demonstrating that the possible presence of blood on the bag was caused by the officers’ conduct, as opposed to Fowlkes’ own conduct of forcing the plastic bag into his anal cavity, or his attempt to push the bag further into his anal cavity during the search. See Thompson v. Souza, 111 F.3d 694, 700 (9th Cir.1997) (“[T]he prisoner ‘bears the burden of showing that [prison] officials intentionally used exaggerated or excessive means to enforce security.’ ” (second alteration in original)) (quoting Michenfelder v. Sumner, 860 F.2d 328, 333 (9th Cir.1988)).
At the same time, the context of the search diminished Fowlkes’ reasonable expectation of privacy and provided a strong justification for the search. Here, Fowlkes was strip searched pursuant to a blanket LBPD policy that all individuals *976 booked on felony charges are subject to a strip search before being housed in “General Population Felony cells.”[9] The undisputed testimony is that the purpose of this policy is to “prevent the introduction of contraband or weapons into the jail.” Thus, because the search here was performed in order to maintain institutional security and order, we should evaluate the reasonableness of the search given this particular context. See Bull v. City & Cnty. of San Francisco, 595 F.3d 964, 971-72 (9th Cir.2010) (citing Bell, 441 U.S. at 547, 99 S.Ct. 1861) (noting that prison policies must be evaluated in the light of the prison’s primary objective of institutional security). The removal occurred during the jail intake process, after a felony arrest supported by probable cause, after Fowlkes attempted to smuggle eon-traband into the jail, and after a lawful visual inspection revealed the contraband in plain sight. Given the government’s interest in preventing the introduction of contraband into the facility, I believe that although removing the protruding object from Fowlkes’ body was an invasion of privacy beyond that caused by a visual cavity inspection, we must conclude from this record that the search was nevertheless reasonable.[10]
On the suppression record before us, which demonstrates the object was removed without any intrusion into the anal cavity,[11] without any significant injury, harm, or pain to Fowlkes, and in a sanitary and private environment, I cannot conclude that the manner of removal was in violation of the Fourth Amendment.[12]
*977 III.
For the reasons above, I believe the seizure of the small baggie of obvious contraband during a constitutionally permissible strip search of a criminal detainee was reasonable under the totality of the circumstances. In concluding, however, it is worth passing upon the “alternative methods” [13] of recovering the contraband alluded to by the majority. See Maj. Op. at 959-60, 964-65, 965-66. The majority mentions these alternatives only with respect to its conception of a reasonable method of seizure. This may be because pleasant alternatives are less obvious under these circumstances.
I suppose the officers could have placed Fowlkes in an isolation cell, handcuffed, partially clothed, and under constant surveillance, allowing them to respond immediately when the baggie worked its way the other inch or so out of Fowlkes’ body. This hardly seems to be, per se, a less intrusive or offensive condition in which to place a detainee. See, e.g., Montoya de Hernandez, 473 U.S. at 548, 105 S.Ct. 3304 (Brennan, J., dissenting) (noting individual was able to avoid passing naturally any of the 88 drug-filled balloons secreted in her alimentary canal for almost 27 hours after initial detention despite her obvious need to use the restroom).
With respect to removal, certainly a medical professional is -always preferable, but it remains a mystery whether one was readily available to assist the officers in removing the baggie and what he or she would have done differently. Without such information and based on the totality of the circumstances, the lack of medical personnel did not render the seizure unreasonable. See Florence, 132 S.Ct. at 1513-14 (“In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security.”); Bull, 595 F.3d at 976 (“When the allocation of resources and the ability of administrators to protect staff and detainees at the facility are at issue, ‘courts should be particularly deferential to the informed discretion of corrections officials.’ ”) (quoting Turner v. Safley, 482 U.S. 78, 90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). In sum, the factual record needed to find a Fourth Amendment violation warranting suppression is lacking.
Accordingly, I respectfully dissent.

. I concur in the reasoning of the majority opinion with respect to all other issues raised on appeal.

. Of course, as an appellate court, we are not to engage in independent fact finding, deferring instead to the findings of the district court unless they are clearly erroneous. In seemingly making new factual findings, the majority appears dissatisfied with the lack of clear factual findings in the district court's order. If this is so, the remedy would be to remand to the district court, not to engage in our own weighing of the disputed facts, without the benefit of live testimony.

. The majority's statement that Fowlkes posed no threat at all to the officers simply is not supported by the record, although it was acknowledged that Fowlkes was not physically aggressive, only verbally aggressive, prior to the search. Maj. Op. at 964-65.

. Contraband refers to any unauthorized item, not just illegal items, including lighters, matches, currency, and pens. See Florence v. Bd. of Chosen Freeholders, -U.S.-, 132 S.Ct., 1510, 1519, 182 L.Ed.2d 566 (2012) ("Contraband is any item that is possessed in violation of prison rules. Contraband obviously includes drugs or weapons, but it can also be money, cigarettes, or even some types of clothing.” (quoting Prisons: Today and Tomorrow 237 (J. Pollock ed.1997))). Here, when the object was pro trading, the officers could see that it was a plastic bag .with an off-white substance inside, and thus it was readily apparent that Fowlkes possessed an unauthorized object. Contrary to the majority's suggestion, I do not believe that the officer's knowledge of the type of contraband secreted inside the arrestee’s body is immaterial, and in this case, we need not consider the situation where the unauthorized nature or general character of the object is not apparent. See Maj. Op. at 965 n. 5.

. As the majority notes at footnote 2, whether a police action is termed a “search” or a "seizure” is immaterial to the legal analysis. Accordingly, the dissent uses the terms interchangeably.

. In Fuller v. M.G. Jewelry, we stated that Schmerber's reference to “intrusions into the body" applies to "all searches that invade the interior of the body ... [including] a visual intrusion into a body cavity.” 950 F.2d 1437, 1449 & n. 11 (9th Cir.1991) (noting the Ninth Circuit, unlike other courts, has not limited Schmerber to cases in which skin is pierced or entry is forced). Thus, even the visual inspection of the body cavity here was an intrusion into the human body under Schmerber, but as noted by the majority, that particular intrusion into the body is justified by the need to maintain institutional security. See Bell, 441 U.S. at 560, 99 S.Ct. 1861. Thus, Schmerber does not require a warrant or exigent circumstances for all searches involving intrusion beyond the body’s surface.

. The majority relies on the Fourth Circuit’s opinion in United States v. Edwards, 666 F.3d 877 (4th Cir.2011). Although the majority there held the search unreasonable because a knife was used to remove a bag of drugs tied to the defendant's genitals, the majority did not preclude any touching of the defendant. See id. at 886. Instead, the majority suggested other permissible alternatives including "untying the baggie, removing it by hand, tearing the baggie, requesting that blunt scissors be brought to the scene to remove the baggie, or removing the baggie by other non-dangerous means in any private, well-lit area.” Id. (footnote omitted). The majority misunderstands this footnote as indicating that the majority’s holding precludes any further touching of a suspect or seizure of contraband from a suspect’s rectum in all future cases. Maj. Op. at 965 n. 6. I make no such suggestion.

. In Carpenter, two judges concurred in the two sentence per curiam opinion to limit the holding to the particular facts of that case. See 496 F.2d at 856 (Chambers, J., concurring) ("I regard the case as one ... of no precedential value except on a similar record.”); id. (Taylor, J., concurring) ("I am constrained to concur in reversing the conviction of appellant only because of the record made on remand....”). In Carpenter, the district court credited testimony from the government’s expert witness that a doctor should have been summoned to dilate the anal cavity and did not credit other testimony from the same expert that the object could be removed by a customs official without danger. Id. at 856. Both concurring judges stated that if not for this particular medical evidence credited by the district- court, they would have concluded that a custom official could remove the protruding object. Id. at 856 (Chambers, J., concurring) (“The customs officer was entitled to assume the probable — that the package was one that went in without much trouble and would come out the same way.”); id. at 856-57 (Taylor, J., concurring) (noting that despite the idealistic testimony of medical experts, common sense dictates that the inspector was entitled to perform the simple process of taking hold of and pulling the protruding end of the condom). As indicated, there is no medical testimony here, and we can only speculate as to what is considered necessary by medical professionals. That LBPD policy requires medical personnel to perform body cavity searches is not the same as medical testimony concerning the safety, propriety, and reasonableness of the search and does not rise to the level of testimony relied on in Carpenter. See Maj. Op. at 963 n. 3.

. My views are not directed to any due process claim in a separate action under 42 U.S.C. § 1983, stemming from the officers’ failure to follow the jail’s own regulations. See Marsh v. Cnty. of San Diego, 680 F.3d 1148, 1155 (9th Cir.2012).

. For this reason, I find the majority’s reliance on the series of cases cited on pages 962-63 of its opinion to be inapposite, as they are outside of the jail context and do not deal with facts analogous to the present case. Under Bull, these cases are distinguishable because "[cjases that address searches of arres-tees at the place of arrest, searches at the stationhouse prior to booking or placement in a holding cell, or searches pursuant to an evidentiary criminal investigation do not control our review.” 595 F.3d at 971.

. The removal of a protruding object raises different, and less grave, considerations for health than when contraband is fully inserted inside a cavity and can only be located and removed through digital penetration and probing. The actual probing for the inserted object may itself cause medical harm distinct from the removal of the item, and the officers may have no idea as to its shape, size, or location. Thus, without evidence we cannot assume a need for medical training when a protruding object is removed.

.Additionally, the facts in this case do not include those that we found, when combined with others, render the manner of removing an item unreasonable. For example, in Vaughan, we found a digital rectum search was performed unreasonably when conducted on an unsanitary table by medical assistants who were not trained in involuntary rectal searches, the assistants did not wash their hands between searches, and the search was visible to other inmates and prison personnel, including female prison officials. Vaughan, 859 F.2d at 741; see also United States v. Cameron, 538 F.2d 254, 258 (9th Cir.1976) (finding two forced digital probes of rectum by a doctor, two enemas, and a liquid laxative administered without the presence of a doctor unreasonable, especially when performed without consideration of the subject's claim that he was under medical supervision for stomach and rectal problems). The search here did not involve penetration of the anal cavity, let alone multiple forced probes and enemas as in Cameron or the unsanitary conditions and lack of privacy as in Vaughan. Officers also took steps to minimize potential harm to Fowlkes and to protect his privacy by conducting the search in an apparently clean, private room dedicated for this purpose and by using medical gloves.

. As the majority concedes, the existence of a less-intrusive alternative "does not, in itself, render the search unreasonable.” United States v. Montoya de Hernandez, 473 U.S. 531, 542, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (noting a creative mind "can almost always imagine some alternative means by which the objectives of the police might have been accomplished”); see Bell, 441 U.S. at 559 n. 40, 99 S.Ct. 1861 (rejecting the "less-restrictive-alternative” test as determinative of reasonableness).